[6 NE3d 586, 983 NYS2d 468]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHRISTOPHER MARTINEZ, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SELBIN MARTINEZ, Appellant.

Argued January 16, 2014; decided February 18, 2014

552

**POINTS OF COUNSEL**

*Robert S. Dean, Center for Appellate Litigation*, New York City (*Marisa K. Cabrera* of counsel), for appellant in the first above-entitled action. I. The trial court's refusal to issue an adverse inference instruction for lost *Rosario* material requires reversal where the court based its ruling solely on the officer's lack of bad faith and where Christopher Martinez suffered prejudice. (*People v Rosario*, 9 NY2d 286; *People v Poole*, 48 NY2d 144; *People v Young*, 79 NY2d 365; *People v Banch*, 80 NY2d 610; *People v Washington*, 86 NY2d 189; *People v Kelly*, 62 NY2d 516; *People v Joseph*, 86 NY2d 565; *People v Wallace*, 76 NY2d 953; *People v Haupt*, 71 NY2d 929; *People v LaFontaine*, 92 NY2d 470.) II. The prosecution failed to prove Christopher Martinez's guilt beyond a reasonable doubt as a matter of law where the only evidence tying Mr. Martinez to the incident was the complaining witness's incredible testimony that he was able to recognize the brief backwards movement of the masked and silent perpetrator due to his occupation as a "repairman." (*Jackson v Virginia*, 443 US 307; *People v Reed*, 64 NY2d 1144; *People v Sandoval*, 34 NY2d 371; *People v Fratello*, 92 NY2d

565; *People v Brown*, 80 NY2d 729; *People v Way*, 59 NY2d 361; *Matter of Dorothy D.*, 49 NY2d 212; *People v Carter*, 63 NY2d 530.)

*Robert T. Johnson, District Attorney*, Bronx (*Ravi Kantha, Joseph N. Ferdenzi* and *Nancy D. Killian* of counsel), for respondent in the first above-entitled action. I. Defendant's conviction was supported by overwhelming evidence. (*People v Scarborough*, 49 NY2d 364; *People v Delamota*, 18 NY3d 107; *People v Rossey*, 89 NY2d 970; *People v Bleakley*, 69 NY2d 490; *People v Conway*, 6 NY3d 869; *People v Ford*, 66 NY2d 428; *People v Norman*, 85 NY2d 609; *People v Deegan*, 69 NY2d 976; *People v Lesiuk*, 81 NY2d 485; *People v Lee*, 221 AD2d 473.) II. The trial court did not abuse its discretion when it declined to issue an adverse inference charge regarding the loss of Officer Franco's handwritten complaint report, and in any event, any error in that regard was harmless. (*People v Stephens*, 84 NY2d 990; *People v Rosario*, 9 NY2d 286; *People v Consolazio*, 40 NY2d 446; *People v Ranghelle*, 69 NY2d 56; *People v Wolf*, 284 AD2d 102; *People v Wallace*, 76 NY2d 953; *People v Haupt*, 128 AD2d 172, 71 NY2d 929; *People v Joseph*, 86 NY2d 565; *People v Jenkins*, 98 NY2d 280; *People v Brown*, 71 AD3d 1043.)

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Rahul Sharma* and *Joseph M. Nursey* of counsel), for appellant in the second above-entitled action. I. The trial court erred in refusing to give a permissive adverse inference charge for the State's failure to preserve *Rosario* material, where there is a strong likelihood that the material contained statements contradicting the complainants' trial testimony. (*People v Joseph*, 86 NY2d 565; *People v Rosario*, 9 NY2d 286; *People v Banch*, 80 NY2d 610; *People v Wallace*, 76 NY2d 953; *People v Haupt*, 71 NY2d 929; *People v Malizia*, 62 NY2d 755; *People v Vilardi*, 76 NY2d 67; *People v Machado*, 90 NY2d 187; *People v Handy*, 20 NY3d 663; *People v Concepcion*, 17 NY3d 192.) II. The trial court prejudiced Selbin Martinez when, over the defense's objection, it erroneously instructed the jury that Armando Irizarry identified an alleged assailant as Selbin from a "portion of his face." (*People v Bell*, 38 NY2d 116; *People v De Jesus*, 42 NY2d 519; *People v Jamison*, 47 NY2d 882.) III. The evidence was legally insufficient to support Selbin Martinez's conviction for attempted robbery, where the only evidence of the offense was a complainant's contradicted testimony that one of the assailants said "give it up," and where the identification of Selbin was based largely upon an indescribable body movement. (*People v*

*Carroll*, 95 NY2d 375; *People v Piazza*, 48 NY2d 151; *People v Calabria*, 3 NY3d 80; *People v Foster*, 64 NY2d 1144.)

*Robert T. Johnson, District Attorney*, Bronx (*Ravi Kantha, Joseph N. Ferdenzi* and *Nancy D. Killian* of counsel), for respondent in the second above-entitled action. I. Defendant's conviction was supported by overwhelming evidence. (*People v Scarborough*, 49 NY2d 364; *People v Delamota*, 18 NY3d 107; *People v Rossey*, 89 NY2d 970; *People v Bleakley*, 69 NY2d 490; *People v Conway*, 6 NY3d 869; *People v Ford*, 66 NY2d 428; *People v Norman*, 85 NY2d 609; *People v Deegan*, 69 NY2d 976; *People v Lesiuk*, 81 NY2d 485; *People v Hawkins*, 11 NY3d 484.) II. The trial court did not abuse its discretion when it declined to issue an adverse inference charge regarding the loss of Officer Franco's handwritten complaint report, and in any event, any error in that regard was harmless. (*People v Stephens*, 84 NY2d 990; *People v Rosario*, 9 NY2d 286; *People v Consolazio*, 40 NY2d 446; *People v Ranghelle*, 69 NY2d 56; *People v Wolf*, 284 AD2d 102, 98 NY2d 105; *People v Wallace*, 76 NY2d 953; *People v Haupt*, 128 AD2d 172, 71 NY2d 929; *People v Joseph*, 86 NY2d 565; *People v Jenkins*, 98 NY2d 280; *People v Brown*, 71 AD3d 1043.) III. The trial court's identification charge was proper in all respects. (*People v Culhane*, 45 NY2d 757; *People v Saunders*, 64 NY2d 665; *People v Hudson*, 251 AD2d 124; *People v Woods*, 199 AD2d 176; *People v Bell*, 38 NY2d 116; *People v De Jesus*, 42 NY2d 519; *People v Jamison*, 47 NY2d 882; *People v Crimmins*, 36 NY2d 230; *People v Kello*, 96 NY2d 740.)

## OPINION OF THE COURT

READ, J.

This appeal calls upon us to decide whether the trial judge abused his discretion when he declined to give an adverse inference charge regarding the loss of the handwritten complaint report (commonly referred to as a "scratch 61") prepared by a police officer who responded to a 911 call reporting a robbery. Defendants Selbin Martinez (Selbin) and Christopher Martinez (Christopher) (collectively, defendants) were subsequently convicted of attempted robbery in connection with this incident. For the reasons that follow, we conclude that the judge did not abuse his discretion.

## I

On Friday, July 17, 2009, at roughly 4:00 p.m., 45-year-old Armando Irizarry, Sr. (Irizarry), a self-employed repairman,

returned from a job to his apartment on the 14th floor of a high-rise building on Havemeyer Avenue in the Bronx. The building is public housing owned by the New York City Housing Authority, and Irizarry had lived in the same apartment there for about seven years. He was well-acquainted with defendants, longtime residents of an apartment on the building's 13th floor. Through the years, he had engaged in casual conversation with them both.

Irizarry saw Christopher "[a]lmost every day . . . hanging out" in the hallway on the 14th floor, "either smoking cigarettes or talking to his friend," who lived on that floor. Christopher and this friend were inseparable. Irizarry owns a Jack Russell terrier, a very nervous dog that "hated" Christopher. When Irizarry left his apartment with the dog to go downstairs and outside to walk her, the terrier would bark at Christopher, who invariably reacted by "run[ning] awkwardly . . . like hopping" as he "back[ed] up away from" the dog, scared. Irizarry also encountered Selbin a few times a week in the building. He noticed that Selbin, too, had "a particular way [of] walk[ing]" and holding his shoulders. Irizarry described himself as "really bad with people and faces," which forced him "to rely on movements and physical characteristics to remember people."

Upon arriving home, Irizarry received a call from his adult son, who had been waiting for him at a neighbor's apartment. Irizarry intended to return to work to finish up a job so that he could get paid for it the next day. But first, after his son "implied that he was hungry," Irizarry ordered takeout from a Chinese restaurant and gave his son $20 to pay for the food. At about 5:00, he accompanied his son into the 14th floor's well-lit hallway on the way to the elevator and downstairs to the lobby to pick up the food delivery.

Two elevators and adjacent stairwells A and B are located outside Irizarry's apartment. Because one of the elevators was typically out of order, Irizarry's son peered through the elevator windows to see which one was working at the time. Meanwhile, Irizarry heard noise in stairwell B. When he opened the stairwell's door out of curiosity, he spotted someone "all in black" crack the door on the floor below and "t[ake] a peek" at him, but he was not alarmed; he closed the door and headed back to the elevator. Suddenly, though, a man emerged from the stairwell, dressed from head to toe in black. His face hidden behind a ski mask that exposed only his mouth and eyes, the man also wore sunglasses, a hat and gloves. Armed with a

baseball bat, he was closely followed by a second man, similarly clad all in black, with his head and face concealed by a hood and a ski mask that exposed only his eyes. The second man carried a gun.

Irizarry "right away" recognized the first man as Selbin "because of the way he walks" and because he is "really slim and tall." Assuming at first that Selbin was just joking around, Irizarry stepped up to him upon his approach and asked, "What's up, Silence?," a reference to Selbin's nickname. In response, Selbin pushed Irizarry and told him to "Give it up." Now fearful that Selbin and his companion intended harm and sensing that Selbin was ready to swing the bat at him, Irizarry pulled out from his pocket a sock in which he had stuffed a billiard ball. He always carried this makeshift weapon with him for protection.

Irizarry threatened Selbin with the billiard ball, and called out to his son to alert him to the danger. Selbin then walked toward Irizarry's son, swinging the bat from side to side and signaling him to be quiet by putting a finger up to his mouth and vocalizing "Shh." As Selbin made this gesture, he inadvertently revealed his mustache.[1] Irizarry's son backed away from Selbin, edging toward the elevators and sliding in the direction of stairwell A.

At that point, Irizarry turned his attention to the other man so as "to put space between" that man's gun and Irizarry's son. As he advanced, brandishing his billiard ball, the gunman immediately retreated to stairwell B by running backward "just like . . . when he [saw Irizarry's] Jack Russell dog. Exactly the same thing," which is when and how Irizarry recognized Christopher.

Irizarry then grabbed his son and pulled him into stairwell A, and closed and blocked the door, which has a window. As Selbin tried to pry the door open and Irizarry, who is much heavier, resisted, Selbin's ski mask shifted, uncovering his chin, nose and cheek. Afraid that Christopher might gain access to stairwell A from another floor and shoot him and his son, Irizarry opened the door slightly, swung "as hard as [he] could" and hit Selbin with the billiard ball, flooring him. Certain that Selbin was "dizzy, confused because [he] hit him hard," Irizarry "decided to run for [his] life" and "drag[ged his] son with [him], all the way downstairs to the first floor," where he called 911 at

---

1. Irizarry's son, however, was unable to identify either perpetrator.

5:47 p.m. Irizarry told the operator that he thought he knew the perpetrators' identities, but he did not then name them.[2]

Irizarry's son had been holding the $20 in his hand while waiting for the elevator, and at some point—he believes when his father jerked him into the stairwell—he dropped the money in the hallway. After making the 911 call, Irizarry and his son went back up to the 14th floor and looked for the $20 to no avail. Before returning to Irizarry's apartment, they did, however, find a single lens from a pair of sunglasses on the floor in front of stairwell A. With this discovery, Irizarry deduced that he must have hit Selbin in the face with the billiard ball.

The day this happened, Police Officer Hairo Franco and his partner were working from 5:30 p.m. until 2:00 a.m. the next morning as part of a plainclothes police unit organized to combat street-level violence. They were patrolling the precinct when they received a radio call from the dispatcher telling them of a 911 call reporting a robbery at the Havemeyer address. They arrived at the building at 5:55 p.m. and went to Irizarry's apartment, where they spoke with him and his son. Irizarry gave the police a description of the perpetrators. He still did not identify either of them by name, however. Officer Franco called the "Viper" unit, responsible for monitoring the security cameras in the building, and learned that no one fitting the descriptions given by Irizarry had been seen leaving the premises. Officer Franco and his partner then canvassed the building, starting at the roof, but found no suspects.

After speaking with Officer Franco, Irizarry and his son were taken to the police station where they spoke to a detective. During this interview, Irizarry identified Selbin as one of the perpetrators. He told the police where Selbin lived, and at about 7:00 p.m. that evening, they arrived at defendants' apartment, where a young girl answered the door and indicated she was alone. When defendants' mother got home from work a few minutes later, the police told her they were looking for Selbin and asked for permission to check the apartment. She agreed. In one of the bedrooms, the officers moved an ironing board obstructing the closet door and discovered Selbin inside, huddling on the floor under a jumble of clothes; he sported a fresh

---

**2.** As related by Christopher's attorney, on the tape of the 911 call Irizarry is heard to say "I think I know who they are . . . Yeah they were wearing masks and a hat and glasses and everything . . . but I think I know who they are." As noted later, the jury heard the tape of the 911 call.

cut and lump on his forehead.[3] Officer Franco placed Selbin under arrest. Christopher, who was in the apartment at the time, was arrested by another officer at 8:00 a.m. the next day.[4]

On July 29, 2009, the grand jury handed down a 17-count indictment accusing defendants of committing various crimes, including attempted robbery, assault, grand and petit larceny, criminal possession of stolen property and criminal weapon possession. At the ensuing joint jury trial in November 2010, Irizarry, his son and Officer Franco testified as narrated. The jury also heard the 911 tape and viewed a photograph taken by Officer Franco at the time of Selbin's arrest to show the condition of his forehead.

On cross-examination, Irizarry conceded that some of the details he recounted in his testimony seemingly differed from contemporaneous accounts based on information that he provided to law enforcement. For example, the detective who interviewed him at the precinct recorded that Irizarry stated that "none of the perpetrators said anything" to him, and the criminal complaint signed by Irizarry did not mention that either of the perpetrators swung a bat at him or his son. He explained these inconsistencies or omissions by saying he was in shock at the time and so may have forgotten to tell the police or the district attorney some details, or they may have neglected to record some details or they may not have fully understood him because of his accent.

Officer Franco on cross-examination acknowledged that the only "paperwork" or notes he created between the time he first arrived at the Havemeyer address and Selbin's arrest were to be found in his memo book. When he returned to the precinct after the arrest, he prepared a scratch 61, which he "put . . . in the bin where it gets filed." Asked if this was "[t]he same file as the other paperwork in this case that was turned over to the prosecutor," Officer Franco answered "No." He confirmed that he never gave the scratch 61, the handwritten complaint report, to the prosecutor and did not have it with him. Neither Officer Franco's memo book nor the typewritten complaint report set out any description of the perpetrators.

---

**3.** Irizarry testified at trial that he did not observe any cuts on Selbin's face when he saw him the previous day.

**4.** It is not evident from the record when exactly Irizarry named Christopher as the other perpetrator. At trial, Irizarry attributed his delay in identifying Selbin and Christopher by name to the shock and trauma he experienced in the immediate aftermath of his encounter with them, and fear of reprisal.

At the conclusion of the People's case, Christopher's attorney requested the scratch 61 prepared by Officer Franco. The prosecutor indicated that this document had never been turned over to the District Attorney's office, and, as she understood Officer Franco's testimony, he could not locate it. Christopher's attorney responded as follows:

> "[Officer Franco] said he put it in the bin where it's supposed to go and—I would call upon for the production of that [sic]. And if that cannot be produced, I would ask that the jury be instructed that they can draw an adverse inference on that."

The judge said he would consider this application, which Selbin's attorney joined.

Selbin presented no evidence; Christopher, however, demonstrated for the jury his manner of walking, running and hopping backward. After the close of evidence, the following exchange took place:

> "[Christopher's attorney]: One quick thing. The scratch 61, Your Honor, is preserving [sic] on that application?
>
> "THE COURT: I am not going to charge. There is a reason to be said he doesn't have it any more [sic], and therefore, I'm not going to give you an unfavorable inference charge."

Both attorneys took exception.

During summations, the defense attorneys characterized Irizarry's testimony as incredible, and adduced various claimed or actual inconsistencies between his trial testimony and prior statements attributed to him. Christopher's attorney stressed that Irizarry identified his client as the gun-wielding perpetrator solely on the basis of a supposedly distinctive, "awkward[ ]" way of backing up. He argued that when Christopher demonstrated his manner of walking backwards for the jurors, they could see for themselves that his client did not move awkwardly. Neither attorney mentioned the lost scratch 61 (*cf. People v Haupt*, 71 NY2d 929, 931 [1988], discussed *infra*).

The trial judge submitted seven counts to the jury: two counts of attempted first-degree robbery (Penal Law §§ 160.15 [4]; 110.00 [attempted forcible stealing of property where a firearm is displayed]; Penal Law §§ 160.15 [3]; 110.00 [attempted forcible stealing of property involving the use or threatened use of a

dangerous weapon]), and a count each of attempted second-degree robbery (Penal Law §§ 160.10 [1]; 110.00 [attempted forcible stealing of property when aided by another person actually present]), attempted third-degree robbery (Penal Law §§ 160.05; 110.00 [attempted forcible stealing of property]), attempted second-degree assault (Penal Law §§ 120.05 [2]; 110.00 [attempting to cause physical injury to another person by means of a deadly weapon or dangerous instrument]), attempted grand larceny in the fourth degree (Penal Law §§ 155.30 [5]; 110.00 [attempting to steal property, regardless of its value, by taking it from the person of another]) and criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [2] [knowingly possessing a dangerous or deadly weapon or instrument with intent to use it unlawfully against another]). As part of the identification charge, the judge instructed the jury that "[w]hen [Irizarry] testified about Selbin Martinez he said he recognized his manner of walking[,] body[ ] shape and saw a portion of his face." Selbin's attorney objected that the trial judge thereby erroneously instructed the jury that Irizarry made a facial identification of Selbin.

On November 19, 2010, the jury acquitted defendants of both counts of attempted first-degree robbery, and also acquitted Christopher of attempted second-degree robbery. The jury, however, convicted Selbin of attempted second-degree robbery, and Christopher of attempted third-degree robbery. On March 10, 2011, Supreme Court sentenced Selbin as a second felony offender to a determinate prison term of 4½ years, to be followed by five years of postrelease supervision; and Christopher to an indeterminate prison term of 1 to 3 years. Both defendants appealed.

In May 2012, a panel of the Appellate Division affirmed Christopher's conviction and sentence, holding that the evidence was legally sufficient and the verdict was not against the weight of the evidence (95 AD3d 677 [1st Dept 2012]). The court noted that Irizarry saw Christopher almost daily and identified him "by a distinctive body movement, which [Irizarry] had seen [Christopher] make many times"; that "[a] distinctive gait or body movement may be a valid means of identification"; and that "the trial court granted [Christopher] permission to demonstrate his gait or body movements, and the jury had an opportunity to make its own judgment regarding their distinctiveness" (id. at 678). The Appellate Division further concluded that the trial judge properly exercised his discretion when he

declined to deliver an adverse inference charge with respect to the lost scratch 61, in light of the absence of evidence of bad faith or prejudice.

In November 2012, a different panel of the Appellate Division rejected Selbin's legal sufficiency and weight-of-the-evidence claims (100 AD3d 537 [1st Dept 2012]). The court noted that Irizarry told the jury that he recognized Selbin, whom "he had seen . . . in his apartment building on a regular basis for years," by virtue of his "body type and . . . manner of walking," and that, additionally, he "saw a portion of [Selbin's] face that was left exposed, and heard him speak during the incident" (id. at 537). Further, a few hours after the crime the police discovered Selbin in his apartment, "hiding in a closet underneath a pile of clothing" with "a bump and a fresh cut on his head," an injury that was consistent with Irizarry's testimony that he fended Selbin off with a blow to the head with a billiard ball (id. at 538). The Appellate Division again concluded that the trial judge properly exercised his discretion in declining to deliver an adverse inference charge with respect to the lost scratch 61.

A Judge of this Court granted Christopher's and Selbin's separate motions for leave to appeal (20 NY3d 987 [2012]; 20 NY3d 1063 [2013]). We now affirm.

## II

In *People v Rosario* (9 NY2d 286 [1961], *cert denied* 368 US 866 [1961]), defendant, convicted of capital murder, contended that the trial judge committed reversible error in refusing to turn over the pretrial statements of three prosecution witnesses for purposes of cross-examination. At the time, our case law obligated the trial judge to inspect a prosecution witness's pretrial statements and disclose to the defense any material at variance with the witness's trial testimony (*see People v Walsh*, 262 NY 140, 149-150 [1933]). After making the requisite inspection, the trial judge in *Rosario* announced some "variances" between statements and testimony and told defense counsel that they might examine and use those portions of the statements containing these discrepancies.

Noting that in *Jencks v United States* (353 US 657, 667 [1957]), the United States Supreme Court had held that in federal prosecutions a defendant was entitled to inspect any statement made by a government witness bearing on the subject matter of the witness's testimony, we commented that

"[t]he procedure to be followed turns largely on policy considerations, and upon further study and

reflection this court is persuaded that a right sense of justice entitles the defense to examine a witness' prior statement, whether or not it varies from his testimony on the stand. As long as the statement relates to the subject matter of the witness' testimony and contains nothing that must be kept confidential, defense counsel should be allowed to determine for themselves the use to be made of it on cross-examination" (*Rosario*, 9 NY2d at 289; *see also* CPL § 240.45 [1] [a] [codifying our holding in *Rosario*]).

We ruled that the trial judge should have disclosed the requested statements in their entirety, and then considered whether the defendant was thereby prejudiced, "whether, in other words, there was a rational possibility that the jury would have reached a different verdict if the defense had been allowed the use of the witness' prior statements" (*Rosario*, 9 NY2d at 291). Applying this standard, we concluded that the judge's error did not prejudice the defendant (*id.*). Accordingly, we affirmed the conviction.

Over time, though, we "eschew[ed] harmless error analysis in cases arising during direct appeal in which the defendant was deprived of *Rosario* material at trial" in favor of a rule always requiring a new trial in this situation (*People v Banch*, 80 NY2d 610, 615 [1992]). We reasoned that "[h]armless error analysis in such cases would necessarily require weighing the potential impeachment value of the withheld material," but "[a]n appellate court . . . is ordinarily no better equipped than the trial court to make such an evaluation, and it was the inadequacy of the trial court in that regard—as compared to single-minded counsel for the accused—that compelled the *Rosario* holding" in the first place (*id.*). Thus, as stated in *People v Ranghelle* (69 NY2d 56, 63 [1986]), where

"the prosecution fails completely in its obligation to deliver [*Rosario*] material to defense counsel, the courts will not attempt to determine whether any prejudice accrued to the defense. The failure constitutes per se error requiring that the conviction be reversed and a new trial ordered . . . [T]he People's good-faith efforts to locate, identify and discover all

*Rosario* material does not excuse their failure to produce covered material."[5]

The so-called *"Ranghelle* Rule" proved controversial within the Court (*see People v Jones*, 70 NY2d 547, 553 [1987] [Bellacosa, J., concurring on constraint of "(t)he recently declared coup de grace that failure to turn over *Rosario* (9 NY2d 286) material 'constitutes per se error requiring that the conviction be reversed' " (quoting *Ranghelle*, 69 NY2d at 63)]), and the law enforcement community. Finally, the legislature, as part of the Sexual Assault Reform Act (L 2000, ch 1), amended the Criminal Procedure Law to add a new section 240.75 to "overturn[ ]" the *Ranghelle* Rule, "a top priority for law enforcement officials for more than 15 years" (*see* Governor's Press Release, 2000 NY Legis Ann at 4). Section 240.75 prohibits reversal where a defendant has been deprived of *Rosario* material at a trial or other proceeding absent a reasonable possibility that the nondisclosure materially contributed to the result.[6]

Notably, the rule of per se reversal epitomized by *Ranghelle* never applied when *Rosario* material was lost or destroyed (*see Banch*, 80 NY2d at 616 [describing this situation as an exception to the *Ranghelle* Rule]). Rather, we required a showing of prejudice as a prerequisite to a sanction (*see e.g. People v Martinez*, 71 NY2d 937, 940 [1988]). Here, defendants argue that they were indeed prejudiced by the unavailability of the scratch 61, and so the trial judge abused his discretion when he declined to issue an adverse inference charge, the mildest sanction available. Additionally, Selbin urges that "there is a strong presumption that the defendant has been prejudiced to at least some degree" whenever *Rosario* material is lost or destroyed and, further, that this principle is implicit in our precedents, citing *People v Wallace* (76 NY2d 953, 955 [1990]) and *People v Joseph* (86 NY2d 565, 570-571 [1995]).

---

**5.** The *Rosario* material at issue in *Ranghelle* was a complaint report, which was given to defense counsel after the evidence closed and before summations.

**6.** Specifically, section 240.75 states that

"[t]he failure of the prosecutor . . . to disclose statements that are required to be disclosed [under the *Rosario* rule] shall not constitute grounds for any court to order a new pre-trial hearing or set aside a conviction, or reverse, modify or vacate a judgment of conviction in the absence of a showing by the defendant that there is a reasonable possibility that the non-disclosure materially contributed to the result of the trial or other proceeding."

The defendant in *Martinez* was convicted of first-degree robbery as a result of an armed holdup of a cafe. Identification was the main issue in the case, and at the *Wade* hearing, the cafe's cashier testified that he had described the robber to police officers immediately after the robbery, and that they wrote down what he said. This was apparently a surprise to both the defense attorney and the prosecutor, who had not previously known that any undisclosed *Rosario* material might exist. The defendant moved to preclude the cashier from testifying on the ground that the written record of his statement to the police officers had not been served upon him.

The court then held a hearing at which an officer testified that on the night of the crime, she and her partner had responded to a radio call for a robbery in progress. When they arrived at the cafe, the cashier came to their car and provided a description of the robber. She saw her partner "writing for a few seconds," either in his memo book or a scratch 61, but did not see what he wrote; he immediately transmitted the cashier's description of the robber over the radio, and the tape of the radio transmission was provided to the defendant (*id.* at 939). The officer who jotted something down was unavailable to testify, and despite diligent efforts, the People were never able to find any notes or follow-up reports he may have created. The judge denied defendant's motion to preclude the cashier's testimony, but gave an adverse inference charge to the jury. The defendant was convicted, and appealed the judge's *Rosario* ruling.

We observed that

> "it is no answer to a demand to produce that the material has been lost or destroyed. If the People fail to exercise care to preserve it *and defendant is prejudiced by their mistake*, the court must impose an appropriate sanction. The determination of what is appropriate is committed to the trial court's sound discretion, and while the degree of prosecutorial fault may be considered, *the court's attention should focus primarily on the overriding need to eliminate prejudice*" (*Martinez*, 71 NY2d at 940 [emphases added]).

Under the circumstances, we noted, the adverse inference charge overcame any "remote" possibility of prejudice owing to failure to turn over *Rosario* material, "if indeed there was any"

(*id.*). This case, then, does not, as defendants suggest, stand for the proposition that a judge must impose a sanction whenever *Rosario* material is lost or destroyed, even if the possibility of prejudice is remote; or that an adverse inference charge must be given for the "inadvertent destruction" of a scratch 61.

In *Haupt*, decided the same day as *Martinez*, the defendant was found mentally incompetent to stand trial and confined to a mental institution for 16 years before he was tried and convicted of murder. During the lengthy lapse of time between arrest and trial, evidence, some of which was *Rosario* material, was lost or destroyed "through inadvertence" (*Haupt*, 71 NY2d at 930). On appeal, the defendant claimed that he was thereby deprived of due process and a fair trial, and the ability to cross-examine witnesses by use of their prior statements; he sought dismissal of the indictment. The Appellate Division held that "under the circumstances, there was no basis for dismissal of the indictment *or the imposition of some lesser sanction* upon the prosecution because of these losses" (128 AD2d 172, 173 [2d Dept 1987] [emphasis added]).

On appeal, we commented that this was not a case like *Ranghelle* where the People did not turn over statements "in their possession or within their power to produce," and the remedy was automatic reversal and a new trial (71 NY2d at 930). We decided that "[w]hen . . . the defendant claims that the loss of the evidence deprived him of a fair trial, the court must consider a number of factors including the proof available at trial, the significance of the missing evidence and whether the loss was intentional or inadvertent" (*id.* at 931). To the extent that any of the lost material "might have a bearing" on the "crucial issue" at trial in this case, which was the defendant's sanity at the time of the shooting, "defense counsel on cross-examination and later on summation, noted its absence and emphasized the People's responsibility for its loss and the potential impact on the defense" (*id.*). This was enough for us to conclude that the defendant was not entitled to dismissal of the charge.

Relying on *Haupt*, Christopher argues that *"[i]n fashioning an appropriate sanction* for the People's failure to preserve evidence, courts should consider the proof available at trial, the significance of the missing evidence, and whether the loss was intentional or inadvertent" (emphasis added). In *Haupt*, though, consideration of these factors resulted in a determination there was no prejudice and so *no* sanction was warranted.

Finally, *Wallace* and *Joseph* are cases where we concluded that the defendants were prejudiced by the deliberate destruction

of *Rosario* material and so sanctions were called for. In *Wallace*, the *Rosario* material consisted of contemporaneous notes taken by an undercover officer to describe the individual from whom he bought drugs, and the arresting officer's notes recording that description as the undercover officer broadcast it to him. The officers destroyed the notes after the arrest. The defendant asked for an adverse inference charge, the trial judge denied the request and the Appellate Division affirmed, concluding there was no fault or prejudice. On appeal to us, the "sole argument [made was that the] defendant was not prejudiced by the discarding of this material and we limit[ed] our review to that question" (*Wallace*, 76 NY2d at 955). Disagreeing with the lower courts, we concluded that "[u]nder the facts of this case," the defendant was "impermissibly prejudiced" and therefore the trial judge abused his discretion when he declined to impose any sanction (*id.*).

In *Joseph*, we framed the issue as whether the People violate their *Rosario* obligations when a document subject to disclosure has been deliberately destroyed and "a testimonial reconstruction is required to establish its contents" (*Joseph*, 86 NY2d at 567). "Concluding that the fallibility of human memory makes the necessary flawless reconstruction all but impossible," we held that "a document that has been destroyed can never be deemed the 'duplicative equivalent'[7] of one that exists and remains available for inspection" (*id.*). The unavailable *Rosario* materials in *Joseph* were envelopes in which the arresting officer placed vials of crack cocaine, and on which he wrote the arrestee's name (there were two arrestees—an accused buyer and an accused seller) and the time and location of the arrest. The arresting officer testified that he destroyed these envelopes after transferring the information on them to his online booking sheet and complaint report.

First, we concluded that the officer's testimony and the disclosed police reports were not duplicative equivalents of the discarded envelopes. Then we decided that, in light of the defense theory (misidentification of the buyer as the seller) and the facts of the case, the defendant had made a "colorable claim of prejudice" (*id.* at 571). We distinguished *Haupt* as a case

---

**7.** We never applied the rule of per se reversal in cases where the withheld *Rosario* material was the "duplicative equivalent" of other material made available to the defendant (*see People v Consolazio*, 40 NY2d 446, 454 [1976]; *see also Banch*, 80 NY2d at 616-617 [describing the duplicative-equivalent rule as another of the rare exceptions to per se reversal for *Rosario* violations]).

where "the relevance of the lost document was marginal," and emphasized the deliberate nature of the envelopes' destruction (*id.* at 571-572). Citing *Wallace*, we therefore held that

> "[g]iven the articulable showing of prejudice that the defendant made, the unavailability of the documents from which a less conjectural showing might have been made and, finally, the circumstances of the documents' loss, the trial court's refusal to impose the limited sanction [of an adverse inference charge] constituted an abuse of discretion as a matter of law" (*id.* at 572).[8]

While the results of these cases differ, based on their particular facts, our rule is clear: nonwillful, negligent loss or destruction of *Rosario* material does not mandate a sanction unless the defendant establishes prejudice (*see Martinez*, 71 NY2d at 940; *Banch*, 80 NY2d at 616). If prejudice is shown, the choice of the proper sanction is left to the sound discretion of the trial judge, who may consider the degree of prosecutorial fault (*Martinez*, 71 NY2d at 940). The focus, though, is on the need to eliminate prejudice to the defendant (*id.*).

Here, defendants did not establish prejudice, as is their burden. Defendants fault the trial judge for not analyzing prejudice when he denied their request for an adverse inference charge, but they did not even mention the word. Instead, Christopher's attorney requested the instruction simply because the scratch 61 could not be produced. The judge essentially (and correctly) ruled that inadvertent loss alone was insufficient to require a sanction.

Of course, it is difficult to imagine how defendants might have been prejudiced by the loss of the scratch 61, as the defense attorneys and the judge all no doubt knew. A scratch 61 is a handwritten complaint report that Officer Franco placed in a bin for typing, likely by a civilian employee of the police department. Defendants were provided the typewritten complaint report, which would have differed from the scratch 61 only if the typist made a mistake—i.e., the handwritten scratch 61 is not subject to editing before typing. Defendants therefore necessarily depend on a series of improbable events to create the

---

**8.** There was a vigorous dissent in this case. The dissenting judge would have held that the defendant did not, in fact, show prejudice as a result of the destruction of the envelopes, and therefore would have affirmed the defendant's conviction (*see Joseph*, 86 NY2d at 573 [Levine, J., dissenting]).

prospect of prejudice. First, there must have been an error in transcription and that error must have resulted in omission from the complaint report of material that appeared in the scratch 61. Additionally, the omitted material must have contradicted something important that Irizarry said on the stand or in other statements made by or attributed to him. Based on such happenstance, Selbin suggests that perhaps "the scratch 61 stated that at some point Irizarry claimed that neither of the assailants said anything to him," in which case the jury would have been less likely to believe that Selbin told him to "Give it up," the only evidence of a threatened forcible taking. The dissent speculates that maybe the scratch 61 "contained a description of the gunman that did not match Christopher['s appearance]" in which case "the People's case against him would have crumbled" (dissenting op at 569).

If conjecture like this, built on a foundation of fortuity, is sufficient for a showing of prejudice, the loss or destruction of *Rosario* material is not just presumptively prejudicial, as Selbin advocates, it is per se prejudicial. And while Criminal Procedure Law § 240.75 does not directly apply in a case where the claim relates to the proper sanction when *Rosario* material has been lost to the defendant's prejudice, its enactment clearly signals the legislature's antipathy toward per se rules leading to the reversal of convictions for *Rosario* violations.

Finally, we have examined and consider to be without merit defendants' claims that their respective attempted robbery convictions are not supported by legally sufficient evidence, and Selbin's claim that the judge's identification charge with respect to him was improper.

Accordingly, the orders of the Appellate Division should be affirmed.

Chief Judge LIPPMAN (dissenting in part). I would find that the trial court erred in failing to give the requested adverse inference instruction as a minimal sanction for the failure to turn over the lost "scratch 61" report. This error was harmless as to Selbin Martinez in light of the overwhelming evidence of his guilt. However, given that the evidence against Christopher Martinez was far from overwhelming, the error cannot be considered harmless as to him. Therefore, I would reverse Christopher's conviction.

Upon discovering that the police officer had filled out a handwritten "scratch 61" that had not been turned over to the

prosecution and which could not be located, defense counsel requested that the court give the jury an adverse inference instruction. The court denied the request. Defendants argue that the "scratch 61" was *Rosario* material and that, had it been produced, as is required, it would have provided additional grounds for cross-examination of complainant.

The People have an obligation to preserve *Rosario* material and to produce it upon demand (*see People v Martinez*, 71 NY2d 937, 940 [1988]). "If the People fail to exercise care to preserve it and defendant is prejudiced by their mistake, the court *must* impose an appropriate sanction" (*Martinez*, 71 NY2d at 940 [emphasis added]; *see also People v James*, 93 NY2d 620, 644 [1999]). When deciding upon a sanction, "the court's attention should focus primarily on the overriding need to eliminate prejudice to the defendant" (*Martinez*, 71 NY2d at 940).

As the majority points out, the per se reversal (or *Ranghelle*) rule never applied to lost *Rosario* material (*see* majority op at 563). Rather, "some showing of prejudice is essential" in cases where *Rosario* material has not been appropriately preserved (*see People v Joseph*, 86 NY2d 565, 571 [1995]). However, we have also observed that, when the document at issue is in fact unavailable, it may be difficult for the defendant to articulate a concrete claim of prejudice, since he cannot know what information the lost document contained (*see Joseph*, 86 NY2d at 571). We therefore recognized that some degree of conjecture is inherent in an objection on this basis (*see Joseph*, 86 NY2d at 571). "Since it was the conduct of the police that resulted in the loss of the [document] and made it impossible to know whether the information [it] contained was consistent with the People's position at trial, the People cannot now be heard to complain that the defendant's showing of prejudice is not sufficiently definite and clear" (*Joseph*, 86 NY2d at 571 [citation omitted]).

The majority opinion cannot be squared with this reasoning. The majority simply concludes that, "it is difficult to imagine how defendants might have been prejudiced" (majority op at 567). This reflects a deficit of imagination: if, for example, the "scratch 61" contained a description of the gunman that did not match Christopher, the People's case against him would have crumbled. Moreover, the majority's ruling provides absolutely no incentive to retain these types of forms. Given the loss of the material, defendants are left to speculate as to what

value that document may have held. It simply is not a satisfactory result to penalize defendant for being unable to establish a concrete injury. Particularly in this case, where the document was prepared between the two defendants' arrests and complainant's identification of Christopher was so delayed, the handwritten complaint report might have been extremely useful. Moreover, the evidence against Christopher was thin and the sanction requested was a modest one. The trial court did not invoke lack of prejudice as a basis for its denial; it merely stated "there is a reason . . . he doesn't have it anymore." Under the circumstances, it was an abuse of discretion for the trial court to deny the requested charge. Similar to the situation presented in *Martinez*, although the prospect that Christopher suffered prejudice by the loss of the "scratch 61" might have been "remote," that possibility would have been obviated by the requested jury instruction (*see* 71 NY2d at 940).

Here, identification was the central issue. The only evidence against Christopher, aside from the nonincriminating fact that he is Selbin's brother, was complainant's testimony identifying Christopher by his "awkward" way of jumping back. The gunman's only feature that was not covered by a mask were his eyes, which complainant specifically testified he did not look at because he was focusing on the gun. The gunman did not make a sound, nor did he sustain any injury that linked him to the incident. Moreover, despite complainant's claim that he knew the gunman was Christopher, he did not provide Christopher's name to the police until after Selbin's arrest. In the absence of overwhelming evidence, "there is no occasion for consideration of any doctrine of harmless error" (*People v Crimmins*, 36 NY2d 230, 241 [1975]).

In *People v Christopher Martinez*: Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN dissents and votes to reverse in an opinion in which Judges RIVERA and ABDUS-SALAAM concur.

Order affirmed.

In *People v Selbin Martinez*: Judges GRAFFEO, SMITH and PIGOTT concur with Judge READ; Chief Judge LIPPMAN concurs in result in a separate opinion in which Judges RIVERA and ABDUS-SALAAM concur.

Order affirmed.