Judgment, Supreme Court, New York County (Laura A. Ward, J.), rendered September 9, 2009, convicting defendant, after a jury trial, of criminal possession of a weapon in the second degree (two counts), assault in the second degree, and attempted coercion in the first degree, and sentencing him, as a second violent felony offender, to an aggregate term of 13 years, unanimously modified, on the law, to the extent of vacating the conviction of assault in the second degree and remanding for further proceedings thereon, and otherwise affirmed.
This appeal arises out of the October 17, 2008 shooting of a 19-year-old victim in which defendant was the shooter and co-defendant Raynell Burgess, acting in concert with defendant, orchestrated the shooting. The victim was Burgess’s codefendant in a pending drug case.
On the night of the shooting, Burgess watched from a distance of approximately 10 to 15 feet as defendant, who was armed with a “big” black “automatic” gun, confronted the victim in a play area of the Lincoln Houses in an attempt to intimidate him into accepting responsibility in the drug case. When the victim asked Burgess if he really wanted defendant to shoot him, *494 Burgess walked over and told defendant to end the victim’s life or he would do it himself. Complaining that defendant was taking too long, Burgess tried to grab the gun from defendant, but defendant assured him, “I got it.”
Burgess walked away, as the victim tried, unsuccessfully, to further engage him. When the victim turned around, defendant was pointing the gun within a few inches of the victim’s face, with his finger on the trigger. The victim grabbed defendant’s wrist and briefly struggled with defendant. Defendant broke free, with the gun still in his hand, but the victim was “not sure” if defendant still had his finger on the trigger. In the aftermath of the struggle, but while defendant was still holding the gun, it discharged, and the victim was shot in the shoulder. Five minutes had elapsed from the time defendant first pointed the gun at the victim.
The victim fled, but re-encountered Burgess, who, using a different gun, aimed it at the victim’s head, and pulled the trigger. The gun jammed. When the victim escaped from Burgess, he went up to a passerby who called 911.
The victim initially was uncooperative with the police, indicating that he did not know who shot him and gave affirmatively misleading information. As the victim would later explain at trial, he was concerned for his family’s safety and did not want to be labeled a “snitch.”
However, after interviewing various witnesses, the assigned detective developed a theory of the shooting and went to speak with the victim at his home a week after the shooting. The victim remained reluctant, but the next day finally identified defendant as the shooter and provided other details of the crime.
Among other charges, defendant and Burgess were indicted for attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), attempted assault in the first degree (Penal Law §§ 110.00, 120.10 [1]), and assault in the second degree (Penal Law § 120.05 [2]). On the second day of deliberations, the jurors sent a note which read, “We the jury request a clarification regarding the law; if an individual intends to assault someone, but the gun discharges accidentally (before he intended to shoot), is that individual guilty of assault? If so, in what degree?” Before the court could respond to the initial inquiry, the jury sent out two more notes, one asking for evidence and one asking the court for the “definition” of the two assault charges, the attempted coercion charge, and “the parameters surrounding those laws.”
When discussing how to respond to the notes, defense counsel urged the court to respond to the notes together because the *495 jury was clearly “struggling with the idea of intent in the assault charge.” The court indicated that it would respond to the notes in seriatim, and specifically asked counsel for input on how to respond to the jury’s hypothetical question. Counsel argued that the answer should be no, particularly in light of the fact that defendant was charged with acting intentionally, not recklessly, as is allowed under other subdivisions of the same statute.
Over objection, the court ultimately responded as follows, “I have three notes from you which I have marked as Court Exhibits XII, XIII and [X]IV
“The first was a clarification regarding the law.
“ ‘If an individual intends to assault someone but the gun discharges accidentally before he intended to shoot, is the individual guilty of assault.’
“The answer to that is yes.
“Your question ‘If so, in what degree’ goes back to the elements which I’m going to charge you on. You have to make that determination. ’ ’
The court went on to restate the elements of the two assault charges and the attempted coercion charge. The jury acquitted defendant of the counts of attempted murder in the second degree and attempted assault in the first degree and convicted him of all other charges, including assault in the second degree.
We agree with defendant that the court’s response erroneously allowed the jury to find defendant guilty of intentional assault without finding that the intent element of that crime existed beyond a reasonable doubt. “It is a well-established rule of law that the intent to commit a crime must be present at the time the criminal act takes place” (People v Rivera, 184 AD2d 288, 291 [1st Dept 1992], appeal dismissed 81 NY2d 758 [1992]). The intent element is not satisfied if, as in the jury’s hypothetical, the individual does not intend to pull the trigger at the moment the gun discharges. While those facts might have supported liability for a crime requiring a lesser mens rea than acting intentionally, defendant here was not charged with such a crime. Because the court’s response to the jury’s note incorrectly signaled that an accidental firing of the gun could support a conviction for intentional assault, the conviction on that count must be reversed.
We affirm the remainder of the conviction, as we find that defendant has not shown that he was sufficiently prejudiced by the remaining alleged Rosario and Brady violations to warrant reversal.
*496 Defendant argues that the trial court should have given an adverse inference charge due to the prosecution’s failure to produce the handwritten notes made by the police officer who interviewed the victim at the hospital after the shooting. While the typed report based on these notes indicated that the victim described his assailant as having a “clear complexion” — a description that the People concede does not match defendant — it was not admitted in evidence because the officer did not remember the victim making the remark and had not checked the typed report against his original notes. Although this officer was called as a defense witness, defendant correctly argues that the missing scratch copy constituted Rosario material as to the victim, who testified for the People, as well as Brady material.
However, defendant is not entitled to reversal based on the trial court’s failure to give an adverse inference charge in this instance. Addressing this question under similar circumstances, the Court of Appeals recently concluded that a trial judge did not abuse his discretion in declining to give an adverse inference charge regarding the loss of a handwritten complaint report (People v Martinez, 22 NY3d 551 [2014]). The Court clarified the rule: “nonwillful, negligent loss or destruction of Rosario material does not mandate a sanction unless the defendant establishes prejudice” (id. at 567). In that case, as here, the handwritten report that could not be found had served as the basis for a typewritten report that was made available to the defendants. The defendants there relied on a “series of improbable events to create the prospect of prejudice” (id. at 567-568). The Court cautioned that if a prejudice finding could be based on “conjecture like this, built on a foundation of fortuity,” loss of Rosario material would be per se prejudicial, which flies in the face of “the legislature’s antipathy toward per se rules leading to the reversal of convictions for Rosario violations” (id. at 568).
Here, defendant’s claim of prejudice similarly lacks merit. Defendant called as a witness the officer who interviewed the victim in order to impeach the victim’s testimony that he did not say that his assailant had a clear complexion. The officer stated that he did not recall what the victim said and that the typewritten report did not refresh his memory. Because the original report could not be found, defendant now argues, he was left without a method to impeach the victim’s testimony, and the court’s refusal to grant an adverse inference charge left him without any recourse for this loss.
Defendant has not shown, however, that an adverse inference charge or the ability to impeach the victim on this issue would *497 have had any impact on the verdict. In defense counsel’s opening statement, he told the jury that the victim changed his story a number of times before coming to the one they would hear, after talking to his lawyers. He told the jury they would learn that the victim is a pothead, a crack dealer, and a deal maker with every reason to lie to “get a pass” on a number of previous arrests. Counsel told the jury that immediately after the incident, the victim told police that he did not know who shot him. He argued that the victim told the truth then, when he thought he might die from the wound, and later lied when it was convenient. Counsel walked the jury through each change in the victim’s story over time. During the defense’s cross-examination of the victim, the holes in his multiple stories were repeatedly brought to light and he admitted a number of times that he lied to the police on several occasions about various details related to the shooting. Defense counsel argued extensively during summation that the victim lied often and had a clear motive to lie in this case.
Defense counsel had ample opportunity to show the jury that the victim’s testimony as to the identity of his shooter was fabricated, and took advantage of this opportunity through repeated attacks on his credibility. On this record, there is no reasonable possibility that extrinsic proof that the victim at one point said his attacker had a clear complexion would have changed the jury’s determination, notwithstanding the victim’s denial of having given that description when asked that question during cross-examination. Furthermore, to the extent this information may have aided the defense case, it bears noting that once the officer could not recall the victim’s having given the prior inconsistent description, defense counsel did not attempt to enter the typed complaint report into evidence through the typist, whose name was on the report and who obviously had seen the handwritten version. Accordingly, we conclude that the trial court did not abuse its discretion in declining to give an adverse inference charge regarding the loss of the report because a sanction is not mandatory for nonwillful, negligent loss or destruction of Rosario material where prejudice is not shown (see Martinez at 567). For the same reasons, the violation of Brady does not warrant reversal either, as there is no reasonable possibility that the missing handwritten copy of the report contributed to the verdict (see People v Vilardi, 76 NY2d 67 [1990]).
Nor is reversal required by the court’s failure to direct the People to disclose the “DD5” Complaint Follow Up Informational Reports made by Detective Keane in connection with his *498 investigation, although we note that these reports did constitute Rosario material that should have been disclosed. It has long been settled that the notes and reports of a testifying police officer witness qualify as Rosario material if they relate to the same subject matter as the officer’s hearing or trial testimony and must be produced to the defense for cross-examination (see People v Malinsky, 15 NY2d 86, 90-91 [1965]; People v Quinones, 139 AD2d 404, 406 [1st Dept 1988], affd 73 NY2d 988 [1989]). Detective Keane’s DD5 reports were, in his words, “what I would do to outline the steps taken in my investigation . . . basically it is a synopsis of my investigation.” Detective Keane testified at trial about that investigation. Therefore, all DD5 reports created by him in connection with the investigation should have been produced to defense counsel, with all redactions necessary to safeguard the identity of any confidential informants. However, reversal is not required by this Rosario violation either, because after considering the substance of the particular undisclosed material and the weight of the remaining evidence against defendant, we do not find a reasonable possibility that defendant would not have been convicted if the DD5 reports had been disclosed.
We perceive no basis for reducing the sentence.
We have considered defendant’s remaining contentions and find them unavailing. Concur — Mazzarelli, J.E, Acosta, Saxe, Richter and Feinman, JJ.