This opinion is uncorrected and subject to revision before publication in the New York Reports.
--------------------------------------------------------------------

No. 166
The People &c.,
            Respondent,
        v.
Everett M. Durant,
            Appellant.




            Janet C. Somes, for appellant.
            Geoffrey Kaeuper, for respondent.
            The Innocence Project and District Attorneys
Association of the State of New York, amici curiae.




ABDUS-SALAAM, J.:

        The increasing availability of electronic recording technology raises many complex questions of law and policy in the realm of criminal justice, most of which we cannot and do not resolve in this case. Instead, we are confronted here with a single narrow question: does the common law invariably require a

- 1 -

court to issue an adverse inference instruction against the
People at trial based solely on the police's failure to
electronically record the custodial interrogation of a defendant?
We answer this question in the negative.  Leaving aside whether a
trial court has the power to deliver such an instruction based on
the unique facts of a particular case, the court does not
necessarily abuse its discretion or otherwise commit legal error
by declining to issue the charge in every case in which the
police fail to record a custodial interrogation.  Thus, although
the better practice would be for the police to use the equipment
at their disposal to record interrogations, their failure to take
such action does not, as a matter of law, automatically compel a
trial court to deliver an adverse inference charge to a
deliberating jury.

I.

Defendant Everett M. Durant was arrested and tried on a
single count of robbery in the second degree (see Penal Law §
160.10 [1]) based on his alleged robbery of Emmett Hunter.  The
People's evidence at trial showed that, on the night of November
28, 2008, Hunter walked past defendant and a group of other young
men near a street corner on the east side of Rochester.
Defendant placed Hunter in a choke hold, possibly rendering him
briefly unconscious.  Hunter then saw defendant holding his
wallet.  As the group started walking away, Hunter called the
police on his cell phone to report the robbery.  Upon observing

Hunter making the call, defendant approached Hunter again and took his phone.  Defendant and the other young men then started punching and kicking Hunter.  After a struggle, Hunter broke away from the group and ran to a nearby fire station, where he pressed an emergency alarm button, causing his assailants to scatter.  Soon thereafter, the police arrived, and they chased down and apprehended defendant.

The police transported defendant to the east side police station because, as Police Investigator Trevor Powell later explained at trial, it was "common practice when a crime occurr[ed] on the east side to go to the east side office," whereas, "[i]f it [wa]s a homicide [one would] take the [suspect] back to the Public Safety Building."  In that sense, Powell observed, "this crime required" the officers to transport defendant to the east side station.  Significantly, Powell explained that the officers at the east side station "didn't have any access" to recording equipment; although the Public Safety Building, which was roughly a 10-minute drive from the east side station, had video recording equipment, no recording equipment of any kind was kept at the east side station.[1]

At the east side station, defendant was placed in an interview room and handcuffed to a table.  Powell entered the room and issued Miranda warnings to defendant (see Miranda v

---

[1]    The west side station had a tape recorder but no video recording devices.

Arizona, 384 US 436 [1966]), and defendant agreed to speak to Powell and answer his questions. When Powell inquired about the reason for defendant's arrest, defendant initially stated that he and his sister had happened upon the scene of a fight in progress earlier that night, and that he had punched Hunter in order to break up the fight. At Powell's request, defendant provided Powell with his sister's phone number, but when Powell called the number, no one answered.

Next, Powell "told [defendant] that it [wa]s time to tell the truth and to man up." In response, defendant changed his narrative of the crime, saying that he had seen Hunter "being crowded by this guy Little C and his brothers" and had joined those individuals in assaulting Hunter. Defendant denied taking anything from Hunter. After defendant made this oral statement, Powell wrote out a version of that statement for defendant to sign, making a few changes to the written version at defendant's request before he signed it.

Due to the lack of a recording of the interrogation, the People's trial proof of the events that unfolded in the interview room consisted solely of Powell's testimony and written summary of defendant's statement. In response to the People's proof, defendant called his sister to the stand, and she testified consistently with his final statement to Powell, alleging that he had merely assaulted, but not robbed, Hunter.

Prior to summations, defense counsel requested that the

court issue a permissive adverse inference charge against the People based on the police's failure to record defendant's interrogation. Counsel gave the court a written copy of his suggested instructions. In sum and substance, counsel proposed that the court tell the jurors that: they could consider the police's failure to record the interrogation in determining the voluntariness of defendant's alleged statement to the police and the weight to be given to it; in the absence of a recording, they did not have reliable and complete evidence of the contents of defendant's alleged statement to the police or whether he had made the statement at all; they should weigh the evidence of the alleged statement with great caution; if the People did not prove beyond a reasonable doubt the existence and voluntariness of the statement, the jurors should disregard it entirely; and "[t]he absence of an electronic recording permits, but does not compel, [the jurors] to conclude that the prosecution has failed to prove that a statement was either actually or voluntarily made, or, if made, that it [was] accurately reported by the State's witnesses." Defense counsel did not request a standard jury instruction regarding the voluntariness of defendant's statement in general, nor did he specifically ask the court to submit the issue of voluntariness to the jury (see CJI2d [NY] Statements [Admissions, Confessions]). The court denied defense counsel's request for an adverse inference charge and related instructions on the jury's consideration of the police's failure to record

defendant's interrogation.

During summations, the court permitted defense counsel to argue that the jurors could not know what actually happened in the interrogation room because the police had failed to record the interrogation. After summations, the jurors deliberated and returned a verdict convicting defendant of second-degree robbery. At a subsequent sentencing proceeding, the court sentenced defendant, as a second felony offender, to a determinate five-year prison term, to be followed by five years of postrelease supervision. Defendant appealed.

The Appellate Division unanimously affirmed the judgment of conviction and sentence, rejecting defendant's contention that the trial court had been legally required to issue an adverse inference instruction based on the police's failure to generate an electronic recording of his interrogation (see People v Durant, 112 AD3d 1366, 1367 [4th Dept 2013]). A Judge of this Court granted defendant leave to appeal (23 NY3d 962 [2014]), and we now affirm.

II.

A

As noted previously, the issue before us is a narrow one. On this appeal, defendant does not contend that the police's decision not to record his interrogation warranted the suppression of his statement on constitutional or other grounds, and therefore we do not opine on questions of suppression and

admissibility which are not before us.  Nor are we called upon to define the boundaries of the trial court's power and discretion, if any, to provide the jury with an adverse inference instruction or other guidance on its consideration of the significance of the police's failure to record an interrogation on a case-by-case basis.  Rather, this appeal presents only the issue of whether, in every case where the police could have, and failed to, make an electronic recording of an interrogation, the trial court must, as a matter of law, invariably issue a permissive adverse inference charge.

To resolve that issue, we must examine the circumstances that have previously been held to warrant an adverse inference instruction in criminal cases.  In that regard, the common law permits, and sometimes compels, a trial court to instruct the jurors that they may draw an inference unfavorable to the People based upon the government's failure to present, preserve or disclose certain evidence, and the court's decision to issue such a charge is reviewable in this Court for abuse of discretion as a matter of law (see People v Martinez, 22 NY3d 551, 567 [2014]; People v Savinon, 100 NY2d 192, 197 [2003]).  A permissive adverse inference instruction typically serves as either: (1) a penalty for the government's violation of its statutory and constitutional duties or its destruction of material evidence; or (2) an explanation of logical inferences that may be drawn regarding the government's motives for failing

to present certain evidence at trial (see generally People v Handy, 20 NY3d 663, 667-669 [2013]; People v Martinez, 71 NY2d 937, 940 [1988]).  For example, the trial court typically must issue an adverse inference charge as a penalty where the State, through its agents, has destroyed existing material evidence in its possession, such as an existing video recording that has been requested by the defense (see Handy, 20 NY3d at 667-669 [2013]).  And, where the State violates its disclosure obligations, an adverse inference charge, and sometimes more severe penalties, are authorized (see Martinez, 22 NY3d at 560-565; People v Haupt, 71 NY2d 929, 931 [1988]).

In addition, as a matter of logic rather than punishment for the violation of a legal duty, the trial court must usually issue a permissive adverse inference instruction where the People fail to present the testimony of a witness and the following three conditions are met:

> "First, the witness's knowledge must be
> material to the trial.  Second, the witness
> must be expected to give noncumulative
> testimony favorable to the party against whom
> the charge is sought. . . . Third, the
> witness must be available to that party."
> (Savinon, 100 NY2d at 197; see also People v
> Hall, 18 NY3d 122, 131-132 [2011]).

"This instruction, commonly referred to as a 'missing witness charge', derives from the commonsense notion that the nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause"

(People v Gonzalez, 68 NY2d 424, 427 [1986] [internal quotation marks and citation omitted, emphasis in original]).

In describing the missing witness rule, the U.S. Supreme Court has analogized it in some respects to the best evidence rule. Specifically, the Court has explained that, under both rules, a party's decision to present secondary or less reliable evidence at trial, despite the party's "possession or power" over "greater" proof, logically suggests that "if the more perfect exposition had been given it would have laid open deficiencies and objections which the more obscure and uncertain testimony was intended to conceal." (Clifton v United States, 45 US 242, 247-248 [1846] [emphases added, internal citations omitted]). Accordingly, a missing witness charge describes the logical inference that a party who possesses and yet withholds superior evidence probably intends to conceal the fact that the superior evidence is unfavorable to it.

Here, as noted, because no existing case law or statute requires a trial court to instruct jurors that they may draw an adverse inference from the police's decision not to record an interrogation, defendant was not entitled to his proposed adverse inference instruction on force of any established legal mandate, and thus the court had to grant his charging request only if the failure to record his interrogation gave rise to circumstances similar to those that have previously been held to necessitate an adverse inference charge. As will be explained, however, none of

the traditional rationales for an adverse inference instruction compelled the trial court in this case to deliver such a charge based solely on the police's failure to electronically record the interrogation of defendant.

<u>B</u>

To begin, no adverse inference instruction could lie in this case based on the government's alleged dereliction of a legal duty, for generally there exists no legal duty which may be breached by the failure to make an electronic recording of an interrogation.  No statute requires the police to generate a video or audio recording of their interrogation of a suspect, and leaving aside any suppression matters, our case law has not recognized a constitutional duty to record interrogations.  Thus, while our precedent does permit -- and sometimes requires -- a court to issue an adverse inference instruction as a penalty for the government's failure to satisfy applicable legal duties, the rationale of that precedent does not support the issuance of an adverse inference instruction based on the police's failure to satisfy a non-existent duty to record an interrogation (<u>see</u> <u>People v Moore</u>, 112 AD3d 981, 982 [3d Dept 2013]; <u>see</u> <u>also</u> <u>United States v Meadows</u>, 571 F3d 131, 146-147 [1st Cir 2007]).

Additionally, this case does not present a situation, like the one in <u>People v Handy</u> (20 NY3d at 663), where the trial court had to, and failed to, give the jury an adverse inference charge in response to the police's decision to destroy existing

material evidence.  In Handy, a police surveillance system created a series of images depicting a portion of the defendant's alleged jailhouse assault on some sheriff's deputies, and those images remained in the possession of the police (see id. at 666). After the defendant had been charged with the crime in a felony complaint, the defendant filed an omnibus motion, in which he demanded all evidence generated by electronic surveillance of the incident (see id. at 666).  Despite the defendant's demand for such evidence, the police destroyed the surveillance images sometime between the defendant's arraignment on the complaint and the filing of the indictment (see id. at 666).  At trial, the defendant requested an adverse inference instruction, and the court denied his request.  Thereafter, the jury convicted the defendant of the assault (see id. at 667).  On appeal, we concluded that the trial court had committed reversible error by denying the defendant's request for an adverse inference instruction, and we held that "when a defendant in a criminal case, acting with due diligence, demands evidence that is reasonably likely to be of material importance, and that evidence has been destroyed by the State, the defendant is entitled to an adverse inference charge" (id. at 666).  We pointed out that the trial court should have issued an adverse inference instruction because such an instruction "gives the State an incentive to avoid the destruction of evidence" and contains fair permissive language based on the failure to present existing evidence, just

as a missing witness instruction does (id. at 669-670).

Thus, in Handy, the need for an adverse inference charge arose only after the police had finished their investigation, the People had charged the defendant with a crime and the police had already acquired evidence which was likely to be material to the defendant's upcoming trial. In that context, the police's wrongful destruction of the evidence and the People's failure to preserve it, while not illegal per se, necessitated an adverse inference charge to, among other things, deter the authorities from affirmatively destroying evidence that they knew, at the time of the destruction, was reasonably likely to be material. However, where the police do not create an electronic recording of an interrogation in the first instance, much less destroy it, they do not know the contents of the potential recording or whether those contents will be material at trial, and there is no deliberate destruction of potentially material evidence that would warrant the deterrent of an adverse inference instruction. Therefore, here, the court was not required to deliver an adverse inference charge to penalize the People for the police's decision not to electronically record their interrogation of defendant.

C

Furthermore, the court did not, as a matter of law, have to provide the jury with an adverse inference instruction to explain the inferences which might logically flow from the

evidence. Contrary to defendant's assertion, the rationale behind a missing witness instruction does not require a court to issue an adverse inference charge in this context because a missing witness instruction is supported by a natural inference about a party's motives in declining to call a particular witness, which is an inference that does not typically apply in cases where the police decline to record an interrogation.

As previously discussed, in cases where a missing witness charge is required, it has already been established at the time of trial that the witness in question: (1) has knowledge material to the trial; (2) would be expected to give non-cumulative testimony favorable to the People; and (3) is available to the People (see Hall, 18 NY3d at 131-132). Given those conditions, it is clear that, if the People have chosen not to call the witness, they have made that choice with full awareness of what the witness knew and would be expected to say, and hence one may fairly conclude that, at the time the People decided to withhold the witness's testimony, they had learned that the testimony would not be as favorable as expected and suppressed it for that reason. Indeed, the People would seldom have any other reason not to call such an important and readily available witness. Under those particular circumstances, then, the court usually must issue an adverse inference instruction based on "the commonsense notion that the non-production of evidence that would naturally have been produced by an honest and

therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause" (Gonzalez, 68 NY2d at 427).

By contrast, the police's failure to record an interrogation does not necessarily suggest that they declined to make the recording because they wished to avoid supplying unfavorable proof at an eventual trial of the suspect. When the police fail to electronically record an interrogation, they do not yet know whether the defendant will speak to them at all, and they have no expectation that he or she will make a statement favorable to them or the People in a future prosecution, as the defendant might freely confess, might stay silent, or might deny the allegations of wrongdoing. In other words, unlike the People in the missing witness scenario, the police do not already know that the recording is more likely to be unfavorable than it is to be favorable. Rather, at the time the police decide whether to record the interrogation, the potential recording is just as likely to be favorable (a conclusive record of a voluntary confession) or neutral (a clear record of a refusal to speak to the police) as it is to be unfavorable (a clear record of either a denial of the charges or a confession blatantly coerced by the police).

Given this uncertainty, one cannot conclude that the police must have acted out of a specific desire to prevent the creation of an objective record of unfavorable facts, and the police's choice is just as likely to stem from an innocent

oversight or a legitimate adherence to a neutral departmental policy. Indeed, this case illustrates that very point; as Investigator Powell testified without contradiction, the police department policy which dictated the detention of defendant at a location that lacked recording equipment was based on the geographical location and severity of the offense, and not on any apparent desire to suppress statements that the police believed would be unfavorable in a future prosecution. Thus, unlike the People's choice not to call a missing witness, the police's decision not to record an interrogation raises a number of equally plausible inferences of the police's intent, and the court need not issue a special instruction to the jurors informing them that such a decision may indicate that the police wanted to withhold potentially unfavorable evidence.

It is for this reason that, contrary to defendant's suggestion, the U.S. Supreme Court's discourse on the missing witness rule in Interstate Circuit, Inc., v United States (306 US 208 [1939]) cannot afford him relief here. In that antitrust case, the Supreme Court decided that the fact finder could have drawn an adverse inference against the corporate defendant due to the corporation's decision to call low-level employees, rather than executives, to the stand to testify about the contested corporate policies that had been ordered by those executives (see id. at 215-220, 225-226). In describing the basis for the adverse inference, the Court stated that "[t]he production of

weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse" (id. at 226).

In context, the Supreme Court's statement that a fact finder may fault a party for the "production" (id.) at trial of weak evidence in lieu of strong evidence did not constitute a declaration that an adverse inference charge may stem from a party's failure to "produce," i.e., create or generate (see Black's Law Dictionary, Produce, [10th ed. 2014] ["produce" can mean "to create"]), a stronger form of evidence which did not exist before.  Instead, the Court was commenting on the situation where: weak and strong evidence of a fact already exist; a party possesses both forms of evidence; and yet the party "produces" only the weak evidence, in the sense of presenting that weak proof at trial (see Black's Law Dictionary, Produce, 10th ed. 2014 ["produce" can mean "[t]o provide (a document, witness, etc.)"]).  In that scenario, the Court reasoned, a party's decision to present the weaker of the two existing forms of evidence indicates that the party knows that the stronger proof is unfavorable to its case (see Interstate Circuit, Inc., 306 US at 225-226).  Here, unlike in Interstate Circuit, Inc., the police did not possess a pre-existing superior form of proof, nor did they suppress such proof in a manner suggestive of their intent to avoid the revelation of clearly unfavorable facts. Instead, the police simply failed to create a superior form of proof in the first place, and they did so at a time when they had

no idea what that proof would show.

D

The foregoing discussion suffices to demonstrate that no existing legal principle or logical extension thereof requires a trial court to issue an adverse inference charge whenever the police could have, but failed to, electronically record an interrogation.  Furthermore, defendant relies only on his proposed categorical mandate for an adverse inference charge, without pointing to any unique factor in his case that might have permitted or compelled the court to issue an adverse inference instruction in the exercise of its discretion.  As a result, the trial court did not abuse its discretion or otherwise err, as a matter of law, by refusing to deliver an adverse inference charge to the jury.

We also note that, beyond the legal infirmity of defendant's position, the rationale behind his argument has the potential to create practical problems because, by logical extension, his rule would apply to numerous cases in which the police have the power to memorialize certain events in a more reliable way and fail to do so.  In particular, defendant's central premise is that the police's failure to create strong objective evidence of a fact material to the defendant's guilt -- in this case an electronic recording of defendant's statement about the crime -- shows that the police determined that an objective record of the fact would be unfavorable to them.  That

premise would logically apply to any case where the police fail to memorialize the existence of some fact via some method other than the memory of the witnesses.  Given the multitude of scenarios in which defendant's proposed rule would arguably apply, our acceptance of his position could entangle the courts in protracted litigation over the boundaries, if any, of defendant's rule, and the courts might frequently issue adverse inference instructions that may not be supported by law or logic.

E

Finally, while we do not adopt defendant's proposal to issue a judicial mandate for adverse inference instructions in all cases involving the failure to record interrogations, we recognize the broad consensus that electronic recording of interrogations has tremendous value, and we note the commendable efforts of the bar, the judiciary and the Legislature to address the complexities of this relatively new frontier of the criminal justice system.  Certainly, there is widespread agreement that electronic recording of custodial interrogations promotes the fair administration of justice.  Because an electronic recording of a custodial interrogation yields a reliable, objective record of the police's interview with a defendant, the recording ensures that the jury at the defendant's trial may evaluate every aspect of the defendant's demeanor, his or her statement and his or her treatment at the hands of the police, thereby enabling the jury to make a fully informed determination of the voluntariness and

meaning of the defendant's statement.  Importantly, according to experts and stakeholders in the field of criminal justice, recordings can reveal circumstances that may have prompted suspects to make false confessions, which are a leading cause of wrongful convictions (see New York State Bar Association's Task Force on Wrongful Convictions, Final Report at 6 [April 2009] [available at https://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26663, last visited 11/4/15]; see also Steven A. Drizin and Marissa J. Reich, Heeding the Lessons of History: The Need for Mandatory Recording of Police Interrogations to Accurately Assess the Reliability and Voluntariness of Confessions, 52 Drake L Rev 619, 622-624 [2004]).

Fortunately, in recognition of those widely-acknowledged benefits of recording interrogations and the need for a legal framework governing this area, stakeholders in the criminal justice system and government have come together to begin addressing this critical issue.  Many bar groups, district attorneys, defense lawyers, judicial task force members and legislators have already crafted worthy proposals to balance various policy interests and create what, in their judgment, is a fair, practical and enduring framework for electronic recording of interrogations (see e.g. New York State Justice Task Force, Recommendations Regarding Electronic Recording of Custodial Interrogations at 3-4 [2012] [available at

http://www.nyjusticetaskforce.com/ElectronicRecordingOfCustodialI
nterrogations.pdf, last visited 11/4/15]; Steven Banks, The Legal
Aid Society, Testimony Before the Council of the City of New York
at 7-10 [Feb 12, 2013] [available at
http://www.legal-aid.org/media/171367/2013.02.12.pdf, last
visited 11/4/15]; District Attorneys Association of the State of
New York, New York State Guidelines for Recording Custodial
Interrogations of Suspects at 1-8 [2010] [available at
http://www.daasny.com/wp-content/uploads/2014/08/Video-Recording-
Interrogation-Procedures-Custodial-FINAL-12-8-10.pdf, last
visited 11/4/15).  The Legislature is currently considering the
enactment of laws based on the important work of those
stakeholders (see 2015 NY Senate Bill S2419; 2015 NY Assembly
Bill A7063).  By drawing policy-based lines that need not follow
the open-ended logic of defendant in this case, the Legislature
can craft legal principles governing recording and adverse
inference charges that realize all of the benefits, and none of
the drawbacks, of defendant's proposed judicial rule-making.
Consequently, in the absence of existing law compelling a trial
court to issue an adverse inference charge in every case in which
the police have failed to take available measures to record an
interrogation, we leave it to the Legislature to consider whether
or not to change the law on this particular issue.

                              III.

        Because defendant's proposed jury instruction was

neither required as a penalty for governmental malfeasance nor akin to a missing witness charge, the Appellate Division properly determined that the trial court did not commit legal error or abuse its discretion as a matter of law by declining to deliver the charge to the jury.  Since we agree with the lower courts' handling of defendant's sole contention on appeal to us, we need go no further to dispose of this appeal.  Accordingly, the order of the Appellate Division should be affirmed.

People v Durant

No. 166

LIPPMAN, Chief Judge (concurring):

I agree with the majority that the trial court did not abuse its discretion as a matter of law by denying defendant's request for an adverse inference instruction based on the failure of the police to electronically record his interrogation. I further agree that there is currently no requirement that such instructions need be given in all cases where a recording was not made. However, I write separately to emphasize that things have changed in many respects since defendant was questioned by the police in 2008. Technology has advanced and significant resources have been expended to equip law enforcement with the ability to video interrogations in the effort to increase transparency and prevent wrongful convictions. Indeed, the overwhelming national trend is toward requiring video recording of custodial interrogation of suspects, either as a matter of a State's duty of fairness or to protect the rights of defendants. Therefore, going forward, trial courts should give serious consideration as to whether adverse inference charges are indicated and, at least in cases involving serious felonies, it may well be that the grant of a defendant's request and the

- 1 -

delivery of the charge is, as a matter of law, the only appropriate course.

The many benefits of recording custodial interrogations are essentially uncontested.  The practice holds significant advantages for the entire criminal justice system.  First and foremost, recording interrogations reduces the instances of false confessions and, by extension, wrongful convictions.  A video recording of the entire proceeding can also obviate any claim that a suspect's confession has been obtained through improper police tactics.  The jury's ability to see exactly what transpired during an interrogation will improve the accuracy of the fact-finding process and facilitate appellate review.  The increased transparency will also promote public confidence in the administration of justice.  As the majority observes, there is no dispute that the recording of interrogations is the better practice (see majority op. at 2).

In accordance with the national trend, courts in other states have grappled with the absence of recorded statements and, in the face of legislative inaction, have drawn upon their supervisory authority to fashion remedies.  For instance, New Jersey's high court established a committee to study and make recommendations on the electronic recording of interrogations (see State v Cook, 179 NJ 533, 847 A2d 530 [2004]) and ultimately adopted a rule, generally requiring electronic recording of interrogations that are conducted in police stations or other

"places of detention," for individuals who are charged with serious felonies (see New Jersey Rules Governing Criminal Practice R 3:17; see also Ind R Evid 617). The failure to record allows the trial court to consider whether the statement should be admissible and is a factor for the jury to consider in determining whether the statement was actually made and, if so, what weight it should be accorded (Rule 3:17 [d]; see also Ark R Crim P 4.7). Where the statement was not recorded, the defendant is entitled to a cautionary instruction upon request (see Rule 3:17 [e]).

The Massachusetts Supreme Court has similarly determined that a cautionary jury instruction is appropriate at a defendant's request, where the prosecution introduces evidence of an unrecorded custodial interrogation (see Commonwealth v DiGiambattista, 442 Mass 423, 447, 813 NE2d 516, 533 [2004]). The instruction advises the jury "that the State's highest court has expressed a preference that such interrogations be recorded whenever practicable, and caution[s them] that, because of the absence of any recording of the interrogation in the case before them, they should weigh evidence of the defendant's alleged statement with great caution and care" (442 Mass at 447-448, 813 NE2d at 533-534).

Other state high courts have determined, also in the exercise of their supervisory authority, that custodial interrogations must be recorded and that the failure to do so can

result in the suppression of the statement at trial (see State v Scales, 518 NW2d 587, 592 [Minn 1994]; In re Jerrell C.J., 283 Wis 2d 145, 172, 699 NW2d 110, 123 [2005] [applicable only to juveniles, but the Wisconsin Legislature subsequently enacted separate legislation providing for a jury instruction for felony suspects (Wis Stat Ann §§ 968.073, 972.115)]]).  Finally, Alaska has held that it is a state due process violation for law enforcers to fail to record a custodial interrogation, where such recording is feasible (see Stephan v State, 711 P2d 1156, 1159 [Alaska 1985]).

Despite the availability of these types of remedies in states as diverse as Alaska and Arkansas, there is currently no such measure in place in New York.  However, electronic recording only becomes easier all the time and there is no legitimate argument why this best practice should not become universal in the interest of a fair and impartial justice system.  Looking ahead, then, when a law enforcement agency has the capability, but fails to create a video record of a custodial interrogation, a judicial response will be warranted.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Order affirmed.  Opinion by Judge Abdus-Salaam.  Judges Pigott, Rivera and Stein concur.  Chief Judge Lippman concurs in result in a separate concurring opinion.  Judge Fahey took no part.

Decided November 23, 2015