(December 22, 2015)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PETER AUSTIN, Appellant. [23 NYS3d 17]—

Judgment, Supreme Court, Bronx County (Patricia Anne Williams, J.), rendered January 10, 2013, as amended May 30, 2013, convicting defendant, after a jury trial, of burglary in the third degree (two counts) and criminal mischief in the fourth degree, and sentencing him, as a second felony offender, to an aggregate term of 7 to 14 years, affirmed.

At trial, the People's witnesses testified that scientific testing had shown that the DNA in blood evidence from the scene of the crime matched defendant's DNA. The blood evidence itself, however, was unavailable at trial because Hurricane Sandy (which had occurred less than a month earlier) had caused the flooding of the warehouse in which the evidence was stored.[1] Contrary to defendant's argument, the trial court did not abuse its discretion in declining his request that the jury be given an adverse inference charge based on the unavailability of the blood evidence. The Court of Appeals has held that "a permissive adverse inference charge should be given where a defendant, using reasonable diligence, has requested evidence reasonably likely to be material, and where that evidence has been destroyed by agents of the State" (*People v Handy*, 20 NY3d 663, 669 [2013]). Here, assuming the materiality of the physical blood evidence and that defendant had requested it with reasonable diligence, the evidence in ques-

---

1. Because it had been flooded by contaminated waters, the warehouse was closed as a health hazard by order of an agency of the federal government, and items stored there, even if not destroyed, could not be retrieved.

tion was not lost or destroyed by agents of the State within the meaning of *Handy*. Rather, the evidence was destroyed or rendered inaccessible as the result of a meteorological event beyond human control. This is not a case where evidence was inadvertently lost through the negligence of government employees or destroyed pursuant to a government policy (*cf. Handy*, 20 NY3d at 666 [the defendant was entitled to an adverse inference charge where video images of a jailhouse incident had been recorded over pursuant to the jail's policy]).

We further note that the materiality of the physical blood evidence itself (as opposed to the DNA analysis thereof) is questionable, at best. It was known from the outset of the prosecution that the People's case would be based on DNA analysis of the blood evidence found at the crime scenes. Nonetheless, beyond making standard discovery requests, defendant took no steps before the hurricane to enforce his right to production of the physical blood evidence. During voir dire, immediately after the hurricane had passed, his counsel announced in a conference call on November 1, 2012, that, having received "all the DNA files," the defense was "ready to go." It was only on the last day of voir dire, November 13, that defense counsel raised the issue of the People's failure to produce the physical blood evidence. Critically, however, defendant has never expressed, either in the proceedings before Supreme Court or on appeal, any intention to conduct his own DNA analysis of the blood evidence.[2] Defendant asserts on appeal that the physical evidence, by itself, might have supported an argument that "the DNA results were not reliable because the DNA evidence was not carefully and properly collected and maintained." Defendant does not explain, however, how the manner of the collection and maintenance of the physical blood evidence at the time it was tested (in 2009) might have been inferred from the appearance of the physical evidence at trial more than three years later (in 2012).

We disagree with the dissent's characterization of the colloquy concerning discovery during voir dire as focusing on the physical blood evidence. In fact, these discussions focused on the expert reports and underlying data files on which the prosecution would be based and, contrary to the dissent, there were not "multiple court orders" specifically directing produc-

---

2. Indeed, defendant's appellate brief states: "That [defendant] had not tested the DNA [evidence] months earlier, had no impact on the defense argument that the People's loss of the DNA evidence should be held against them at the time of trial, because the results of the tests were only a part of what the jury was asked to examine."

tion of the physical evidence.[3] When voir dire began, the prosecution itself did not have all of the DNA documents (some of which apparently had not yet been completed), a circumstance of which the court emphatically disapproved. However, the court also noted with displeasure that the defense had not taken any steps to enforce its right to production of these documents during the approximately 2½ years that had passed since defendant's indictment in April 2010. Ultimately, the court and counsel held an on-the-record conference call on November 1, 2012 (just after the hurricane had passed), at which defense counsel stated that he had "got[ten] all the DNA files from [the prosecutor]" by email and had "already gone through everything so we are ready to go." Again, only after the lapse of nearly two more weeks, on November 13, the last day of voir dire, did defense counsel make an issue of the physical blood evidence.

We also disagree with the dissent's view that the loss of the physical evidence as a result of flooding caused by a natural catastrophe constitutes "los[s] by inadvertence" for which the People may be penalized by the giving of an adverse inference charge under *Handy*. Even if the inadvertent loss of evidence through the negligence of State employees (as opposed to deliberate destruction, as occurred in *Handy*) would require the delivery of a *Handy* adverse inference charge, we cannot see any "inadvertence" with which the State can be charged here. The evidence was stored in a storage facility that was flooded as the result of a hurricane. In our view, the State cannot be deemed at fault for the loss of this evidence, in the way it might be held responsible (under the principle of respondeat superior) for a state employee ruining the blood swabs by spilling a soft drink on them, based on the State's placement of the storage facility at a site that turned out to be vulnerable to flooding under extreme weather conditions that rarely occur. We do not believe that this kind of exercise of a discretionary governmental function was what the Court of Appeals had in

---

**3.** On the first day of voir dire (October 24, 2012), the court made a vague and ambiguous statement that the defense was entitled to receive "whatever it is that they used in making their examination and comparison of the DNA." This may have been a reference to the physical blood evidence found at the crime scene. The court's statement may also have been a reference to files containing the raw DNA data from the crime scene evidence and from defendant, which were compared to identify defendant as the perpetrator and provided the basis for the expert's report making the identification. In any event, it appears that the physical blood evidence did not again become the subject of on-the-record colloquy until the last day of voir dire, November 13, after the hurricane had passed.

mind when it indicated that a loss of evidence resulting from "a good faith error by the State" (20 NY3d at 669) could be the basis for an adverse inference charge. Indeed, the Court of Appeals has very recently highlighted that *Handy*'s rationale is to "deter the authorities from affirmatively destroying evidence that they knew, at the time of the destruction, was reasonably likely to be material" (*People v Durant*, 26 NY3d 341, 350 [2015]; *see also id.* at 347 [the adverse inference charge required by *Handy* is "a *penalty* where the State . . . has destroyed existing material evidence" (emphasis added)]). In this case, the loss of the evidence in question did not result, either inadvertently or by design, from any conduct from which the State should be deterred by the penalty of an adverse inference instruction.

The dissent, while not going so far as to suggest that the State should be penalized for its choice of location for the storage facility, takes the position that *Handy* and *Durant* mandate an adverse inference charge based on the People's having failed to comply with their obligation to produce the physical blood evidence before the hurricane happened to destroy it. However, the *Handy* adverse inference charge is a penalty for destruction of evidence, not for mere tardiness in producing it.[4] While we do not condone the People's slowness in fulfilling their disclosure obligations in this case, the evidence in question was not lost as a foreseeable result of the passage of time, but as a consequence of a natural catastrophe that happened to occur just before this case went to trial. Moreover, the delay in production of the evidence here appears to be as much the fault of the defense as of the People. Even though the defense always knew that the case would rely on DNA evidence, defense counsel, after making a pro forma request to which the physical blood evidence would have been responsive, never took any steps before the hurricane, over a period of approximately two years, to enforce defendant's right to production of that evidence. As previously noted, the physical evidence did not

4. While the dissent points to a statement in *Durant* that "where the State violates its disclosure obligations, an adverse inference charge . . . [is] authorized" (26 NY3d 341, 347 [2015]), this dictum does not mean that any disclosure violation, bearing any causal connection to the loss of evidence, necessitates an adverse inference charge as a matter of law. Notably, the statement in *Durant* highlighted by the dissent is followed by a citation to *People v Martinez* (22 NY3d 551 [2014]), in which the Court of Appeals held that, under the circumstances of that case, the trial court did not abuse its discretion in declining to give an adverse inference instruction concerning the nonwillful, negligent loss or destruction of *Rosario* material.

become a focus of the discussion among the court and counsel until after the hurricane had passed.[5]

We see no support in the record for the dissent's position that the physical blood evidence from the crime scene was somehow material to the defense. As previously discussed, while the dissent correctly notes that the match of defendant's DNA with the DNA in the crime scene evidence was "the lynchpin of the People's case against defendant," placing before the jury the physical blood evidence from the crime scene would not have told them anything about the accuracy of the DNA match. Indeed, this appears to have been the original conclusion of defense counsel, who, without ever having had an opportunity to examine the physical evidence, announced that he was "ready to go" to trial before he learned that such evidence was no longer available. Nothing but speculation supports the dissent's unlikely supposition that the appearance of the physical blood evidence at trial might have told the jury anything about "the manner of its collection, storage or handling" at the time the State analyzed its DNA, three years before trial. The condition of the physical evidence after the State conducted its analysis is irrelevant, since defendant has never expressed any interest in conducting an independent DNA analysis.

Finally, because the readily explained absence of the physical blood evidence at trial was not logically probative of the reliability of the DNA analysis on which the prosecution was based, the court's restriction of defense counsel's summation comments on the absence of such evidence did not constitute reversible error. In this regard, we note that defense counsel was permitted, in his summation, to attack the reliability of the chain of custody of the physical blood evidence on other grounds. Concur—Gonzalez, P.J., Friedman and Kapnick, JJ.

Gische, J., dissents in a memorandum as follows: At stake in this case is not whether the People proffered an acceptable explanation for the unavailability of crucial DNA evidence. The destruction of evidence as a result of post Hurricane Sandy flooding is a bona fide reason for its unavailability at trial. Rather, the issue before us is whether the jury, as opposed to the judge, gets to decide what weight, if any, to assign to the unavailability of important evidence in this case. I believe that the Court of Appeals decisions in *People v Handy* (20 NY3d 663 [2013]) and *People v Durant* (26 NY3d 341 [2015]) support a

---

5. We also note that the dissent's position raises the question of what length of a delay in producing evidence before it happens to be destroyed by an unforeseeable natural disaster would warrant an adverse inference charge. The dissent offers no guidance for answering this question.

conclusion in this case that the decision regarding the weight afforded to the DNA evidence destroyed while in the People's custody and possession, including the reasons it is no longer available, belongs to the jury, not the judge. This is because the People were ordered to, but did not, produce this evidence before its destruction. The Judge, in refusing to give the requested permissive jury instruction that the jurors could, if they wanted, draw an unfavorable inference from the missing evidence, improperly usurped for herself the juror's role in evaluating the excuse given for the unavailability of blood samples collected by law enforcement in this case. This error was compounded when the Judge sustained her own objection to defense counsel commenting on the missing evidence during summation. I, therefore, respectfully dissent and would reverse the conviction and remand for a new trial.

Defendant was convicted of two counts of burglary in the third degree and one count of criminal mischief in the fourth degree, stemming from a robbery of a vacant store and a dry cleaners, both of which were located in the same commercial building on East Gun Hill Road in the Bronx. The break ins were discovered by the owner of the dry cleaners, when he came to work at 8:00 a.m. the morning of June 30, 2009. He found his store "messed up," and that money (approximately $6,000) and a pair of sneakers were missing. In addition, he observed that the basement door had been dented and opened. The landlord was contacted and arrived at the building shortly thereafter. She discovered that not only had the dry cleaning store been burglarized, but a connected vacant office had also been broken into. She observed blood streaks on a rear door on which a glass panel had been broken.

During the ensuing police investigation, swabs were taken of the blood observed on the door. No usable fingerprints were found at the crime scene. Almost a year after the incident, DNA testing of the blood sample turned up a match to defendant's DNA contained in a statewide data bank. In July 2012, the People had defendant re-swabbed, obtaining the results of that testing only two days before voir dire of the jury began. Since 2009, the People retained custody of the physical blood evidence from the crime scene, along with the original copies of the reports and other supporting evidence. There is some ambiguity in the People's representations about the physical location of the DNA evidence, but by the time the trial began, the evidence was being held at the NYPD Kingsland Avenue Storage Facility.

There were ongoing discovery disputes, mostly centered on the People's failure to turn over any part of the DNA evidence. During a June 9, 2011 conference, the court set a deadline of June 24, 2011 for completion of all discovery. Notwithstanding the court's order, on October 24, 2012, when jury selection was about to begin, the People had still not provided any of the original DNA evidence to defense counsel, who again requested it. The Judge commented on the importance of the information for cross-examination purposes. Defense counsel expressly stated that he was "entitled to more than just the reports" and the Judge agreed, stating that the defense was "going to get whatever it is that [the ADA's] got" including whatever was used in examining and comparing the DNA. While the overall colloquy generally concerned the People's failure to have provided any part of the original DNA file, it clearly and necessarily included the failure to provide the physical blood evidence from which the DNA was obtained.

At some point the People represented that the evidence had been stored at the Erie facility. At another point the People claimed that because the lab had only completed its report on the re-swabbed DNA two days earlier, it could not provide any part of the original file until it was released from the lab. The ADA represented that she had been working on obtaining the DNA evidence for defense counsel for the last month. By the completion of voir dire and with opening statements scheduled to start the next day, although defense counsel had copies of some reports, the defense still had not received the DNA file with the original evidence. The People represented at that time that they expected to have the material from the lab no later than the next morning. The court directed that the trial proceed and that the DNA evidence be produced. The People were never relieved of that obligation.

The People had still not produced the DNA file before October 29, 2012, when Hurricane Sandy made landfall in the New York City metropolitan area. Due to the State of Emergency that followed, the trial of this matter was interrupted. When the trial resumed, the People reported that the DNA evidence it had intended to produce was either lost or destroyed while in a storage facility that had flooded in the hurricane and that the storage facility had been closed by OSHA.

At trial, the People called a DNA expert to testify about the DNA testing results. Other than the DNA profile of the swabbed blood matching defendant's DNA, there was no other evidence linking defendant to the crime scene or otherwise identifying him as the perpetrator of the crime. There were no

eyewitnesses. Although there was a surveillance video from a security camera at the scene, the nature and quality of the image was not sufficient to identify defendant. No usable fingerprints were found at the scene. There was no confession, or indeed, any incriminating statements made by defendant that the People were relying upon in proving its case.* The claimed missing items were never recovered.

The defense requested that the jury be given a permissive adverse inference charge in connection with the missing DNA evidence. The court denied the request, based on its own assessment that Hurricane Sandy provided a good reason for non-production of evidence. During summation defense counsel argued to the jury: "There is no DNA at all in evidence in this case. Not one thing . . . Of course you are probably going to hear an argument that says; well, it was destroyed by Sandy the hurricane that it and it is unfortunate . . . The problem with that is that you don't really know, and I don't know, and they don't know, which is even scarier, where this stuff really is or who touched it." Without objection by the prosecutor, the court sustained its own objection to defense counsel's argument about the missing DNA evidence. The prosecution was then permitted to state in its closing: "You also know the exact circumstances why [the DNA is] not here. Because, unfortunately, our city suffered-forget about our city, our state and the whole eastern seaboard got to meet Hurricane Sandy, and Hurricane Sandy, as you heard from Sergeant Apuzzi who is the head of the Kingsland Facility . . . also flooded the current facility that is holding these items and we cannot bring them here for you because a federal agency closed it as toxic."

In the first instance, I disagree with the majority to the extent it questions the materiality of the physical blood evidence. The only evidence connecting defendant to the crimes of which he was convicted was the blood evidence found at the scene. The accuracy of the DNA match analysis was not just material, it was crucial and the lynchpin of the People's case against defendant. Defense counsel was entitled to physically examine that evidence and decide whether based upon the manner of its collection, storage or handling, there was any basis to make arguments to the jury discrediting the conclusions reached by the lab that analyzed it. The fact that defense counsel never sought independent testing of the blood did not lessen its materiality or importance for production at trial. Since the evidence was never produced, and its qualitative condition is unknown, we cannot know what impact the condi-

---

* Defendant's only statements were apparently exculpating.

tion of the physical evidence may have had on the jury's decision to credit the conclusions reached by the People's expert.

The jury instruction requested by defense counsel would have allowed the jury to consider the unavailability of the blood samples and make its own evaluation of the weight to be afforded to the People's DNA expert. The jury would have further been instructed that the law permits them, but does not require them, to infer, if they believe it was proper to do so, that had the evidence been preserved its contents would not support or would be inconsistent with the witness' testimony on this issue.

In *People v Handy* (20 NY3d 663 [2013], *supra*), the Court of Appeals held that, under New York law of evidence, a permissive adverse inference charge must be given where a defendant, using reasonable diligence, has requested evidence reasonably likely to be material, and where the evidence has been destroyed by agents of the State. In *Handy*, a permissive adverse inference charge was required where the State had destroyed material evidence in its possession, consisting of a video recording that defense counsel had requested (20 NY3d at 667-669). The Court held that even if the destruction was inadvertent, the instruction was still required. In the very recent case of *People v Durant* (26 NY3d 341 [2015], *supra*) the Court of Appeals once again examined the issue of when a permissive adverse inference instruction is required. Recognizing that the instruction typically serves as either "(1) a penalty for the government's violation of its statutory and constitutional duties or its destruction of material evidence; or (2) an explanation of logical inferences that may be drawn regarding the government's motives for failing to present certain evidence at trial," the court declined to hold that such an instruction was required where the police could have, but failed to, electronically record a custodial interrogation of the defendant (*Durant*, 26 NY3d at —, 2015 NY Slip Op 08609, *4). In part, the Court's holding was based upon the fact that the government had no legal duty to make an electronic recording of an interrogation. The Court recognized, however, that the instruction should be given where the government has destroyed existing material evidence in its possession, or "where the State violates its disclosure obligations" (*Durant*, 26 NY3d at 347).

Here, the DNA evidence was indisputably within the People's custody and control since the inception of the investigation of the crime scene. There is no dispute that the People had a legal duty to preserve and also to disclose such evidence (*People*

*v Kelly*, 62 NY2d 516, 519-520 [1984]). While the People did not physically destroy the evidence, they did violate their duty to disclose the evidence before it was destroyed. We know that the DNA file was not produced before trial, despite multiple court orders requiring its production before it was destroyed. By at least the beginning of voir dire, the court's direction that defense counsel was entitled to everything the People had in its possession to reach the conclusion of the DNA match, required that the blood samples needed to be turned over. Had the People produced the blood samples when ordered to do so, or even when they represented they would do so, there would be no issues related to their destruction.

I acknowledge that defense counsel could have been more diligent in pursuing the production of this evidence, especially given the court's order requiring discovery to be complete in June 2011. In fact, the trial Judge admonished counsel for not acting sooner. But the standard under *Handy* is not whether defense counsel could have been more diligent in seeking the discovery, but rather whether counsel was reasonably diligent. Defense counsel in this case made a discovery demand before trial for the DNA file, at a time when the People could and should have easily produced it. I believe this aspect of *Handy* has been satisfied. The evidence was indisputably destroyed while in the People's custody and control. The People were directed to produce it, but failed to do so when they could, i.e., before it was destroyed. The majority claims that because the evidence was destroyed by Hurricane Sandy, an act of God, it was not destroyed by agents of the State, and, therefore, *Handy* does not apply. I believe that the majority is reading the phrase "agent of the State" as referenced in *Handy* far too narrowly. In deciding *Handy*, the Court of Appeals makes it abundantly clear that the instruction should be given even where destruction of evidence is not deliberate or done in bad faith (*Handy* at 669). The Court stated: "Our rule is unlikely . . . to increase greatly the risk that a good faith error by the State will lead to a guilty defendant's acquittal. We hold only that the jury should be told it *may* draw an inference in defendant's favor. This instruction . . . could be labeled a 'missing evidence' instruction—not unlike the 'missing witness' instruction given when a party fails to call a witness who is under that party's control and might be expected to give favorable testimony. The instruction 'neither establishes a legal presumption nor furnishes substantive proof' " (*id.* at 669-670 [citations omitted]).

Evidence lost through inadvertence does not excuse a loss. Additionally, under *Durant*, where evidence that should have

been, but was not, produced during discovery is now unavailable, the instruction is necessary to eliminate the prejudice to the defendant (*see People v Martinez*, 71 NY2d 937, 940 [1988]; *People v Haupt*, 71 NY2d 929 [1988]). Because the instruction is a permissive one, the jury would have been free to draw its own conclusions about the effect Hurricane Sandy had on the unavailability of the DNA evidence.

