Matter of Ladapo (Altagracia D.) (2025 NY Slip Op 50354(U))

[*1]

Matter of Ladapo (Altagracia D.)

2025 NY Slip Op 50354(U)

Decided on March 21, 2025

Supreme Court, Queens County

Dunn, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 21, 2025
Supreme Court, Queens County

In the Matter of the Application of Dr. Ademola Ladapo, Director of Adult Inpatient Psychiatry, Department of Psychiatry, City Hospital Center at Elmhurst, Petitioner, For an order authorizing the medication of and performance of routine lab work and EKG upon Altagracia D., a patient at said hospital, Respondent.

Index No. 500485/2025

For the petitioner:
McAloon & Friedman, P.C.
Attorneys for the Petitioner
One State Street Plaza
New York, New York 10004
By: Fernando Mercado, Esq.
For patient:
Mental Hygiene Legal Services
3333 New Hyde Park Road, Suite 306
New Hyde Park, New York 11042
By: Brendan Barnes, Esq.

Scott Dunn, J.

I. INTRODUCTION
Altagracia D. ("Altagracia D." or "Respondent") is a patient at Elmhurst Hospital ("the "Hospital" or "Petitioner"). The Hospital filed an Order to Show Cause seeking to involuntarily medicate Altagracia D and to authorize the performance of routine lab work and an EKG. [*2]Respondent opposes the application. As such, a hearing was held before this Court on March 13, 2025, regarding the Order to Show Cause. Altagracia D. did not attend that hearing, and, neither did any of the Hospital staff involved in her treatment. Following, the hearing, the Court rendered an oral decision denying the Hospital's application without prejudice to renew. The Court now renders its written decision to more fully set forth its reasoning. II. FACTS
By Order to Show Cause dated March 10, 2025, the Hospital commenced this action, pursuant to the Mental Hygiene Law, seeking, in the main, an order to compel the administration of medication on Respondent. The Order to Show Cause was supported by the Petition of Dr. Ademola Ladapo, the Director of Adult Inpatient Psychiatry, Department of Psychiatry, at the Hospital, and Dr. Emmanuelle Duterte, an attending physician, Department of Psychiatry at the Hospital, who oversaw Respondent's treatment and care. Specifically, the Hospital sought authorization to medicate the Respondent with Haldol, with the option to convert to Haldol Decanoate, Prolixin, Risperidone and Clozapine. The Hospital also sought authorization to administer Ativan. Finally, the Hospital sought authorization to administer various laboratory tests as well as an EKG (see the Order to Show Cause).
On March 13, 2025, a hearing was held on the Hospital's application. The Hospital presented one witness, Dr. Kamil Dar. Counsel for Respondent stipulated to Dr. Dar's expertise in the field of psychiatry as well as to the admission of the Hospital records for the current admission of the Respondent, subject to redaction. Tr.[FN1]
at p. 2.
Dr. Dar testified that the Respondent was admitted to the Hospital on February 28, 2025. Tr. at 3. He testified that she presented with a disorganized thought process, was very irritable, internally preoccupied and agitated. Tr. at 3. Based on the above, Altagracia D. was diagnosed with Schizophrenia. Tr. at 3. Dr. Dar further testified that Respondent lacked insight into her mental illness and lacked the capacity to make a reasoned decision regarding her medication. Tr. at 3. Dr. Dar based his conclusion on the Respondent's disorganized thought processes and her internal preoccupation which led her to refuse to accept medication because "someone has been telling her not to take meds" Tr. at 3. Dr. Dar noted, however, that the Respondent had not shown any aggressive behavior while at the Hospital. Tr. at 3.
Dr. Dar further testified as to the medications that the Hospital sought to administer. Tr. at 4. Dr. Dar testified that the Hospital had attempted to discuss the proposed medical treatment with the Respondent, but that the Respondent had refused to engage in discussions relating to her treatment and was in any event, not able to comprehend the suggested treatment. Tr. at 4. Finally, Dr. Dar testified that the proposed medical treatment was optimal for the Respondent, that the benefits of treatment would outweigh any risks, that any side effects could be monitored, and that he did not have any health concerns about her taking the medication. Tr. at 5.
On cross-examination, Dr. Dar acknowledged that the Respondent's primary care provider was Ms. Osbourne, a nurse practitioner. Tr. at 6. Dr. Dar further testified that Dr. Duterte was the supervising psychiatrist on the Respondent's case, but that Dr. Duterte could not testify at the hearing as she was "not here today and for the remainder of the week " Tr. at 7. As such, Dr. Dar testified that he was in court covering for her and that he had taken over the matter on the day of the hearing. Tr. at 7. In this regard, Dr. Dar acknowledged that he had never spoken with the Respondent, had never met her, and had reviewed her records for the first time the day before the hearing. Tr. at 7. Indeed, Dr. Dar ultimately testified that while he did have a discussion with Dr. Duterte, that he did not have an independent assessment of the Respondent, but that his assessment was based solely on the notes that he read. Tr. at 11.
In terms of the treatment itself, Dr. Dar acknowledged that he did not know if the Respondent had taken Haldol, Prolixin, or Risperdal before admittance to the Hospital. Tr. at 8. Dr. Dar did testify, however, that he believed that the Respondent had been taking Clozapine "but stopped it" because of lab abnormalities. Tr. at 8. Specifically, Dr. Dar testified that based on the notes that he reviewed, the outpatient psychiatrist withheld the plan to restart Clozapine because the labs showed that the Respondent had a low Neutrophil count. Tr. at 8. Dr. Dar testified that Neutrophil is a type of white blood cell and white blood cells are necessary for providing for defense against any form of infection. As such, Dr. Dar stated that a low Neutrophil count increases the risk of infection. Tr. at 9. In this regard, Dr. Dar testified that one of the side effects of Clozapine could be to lower the Neutrophil count and that could possibly be dangerous. Tr. at 9. He also testified that Haldol, Prolixin, and Risperdal could have similar side effects. Tr. at 9.
III. DISCUSSION
A. Legal Standard
In this State, where, as here, an entity wishes to rely on its parens patriae power to force administration of a medical procedure on an unwilling patient, that entity must satisfy the test set forth in Rivers v. Katz (67 NY2d 485 [1986]). Pursuant to Rivers v. Katz, as a threshold matter, the State bears the burden of demonstrating by clear and convincing evidence the patient's incapacity to make a treatment decision (67 NY2d at 497). Thereafter, if the court concludes that the patient lacks the capacity to determine the course of his own treatment, the State must then establish by clear and convincing evidence that "the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternate treatments" (Rivers, 67 NY2d at 497-98; see also Samuel D. v Mid-Hudson Forensic Psychiatric Ctr., 171 AD3d 1172, 1173 [2d Dept 2019]).
B. Absence of Attending Personnel
The Hospital did not present the testimony of any hospital health care provider involved in the daily care of the Respondent. Two individuals, Dr. Duterte, the attending psychiatrist, and [*3]Ms. Osbourne, a nurse practitioner, are involved in Respondent's care. Dr. Dar, however, the Hospital's sole witness, is not. Indeed, Dr. Dar has had no interaction whatsoever with the Respondent. As a threshold matter, from the Court's perspective, the Hospital's failure to present a witness who was actually involved in the Respondent's care, presents both evidentiary issues and issues of due process.
From an evidentiary perspective, in Matter of Adam K. v Iverson (110 AD3d 168 [2d Dept 2013]), the Appellate Division conducted an exhaustive analysis of the application of the "missing witness rule" to a situation almost identical to the one here, where the attending health care providers did not testify in a matter involving application of the Mental Hygiene Law. In that case, the lower court had considered that issue sua sponte. We will do so as well.
As set forth in Adam K., "[a] missing witness instruction ... tells a jury that it may draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events" (Matter of Adam K., 110 AD3d at 176, quoting People v Hall, 18 NY3d 122, 131 [2011] [internal citation and quotation marks omitted]). The basis of the rule "derives from the commonsense notion that the nonproduction of evidence that would naturally have been produced by an honest and therefore fearless claimant permits the inference that its tenor is unfavorable to the party's cause" (People v Gonzalez, 68 NY2d 424, 427 [1986] [internal citation, quotation marks, and emphasis omitted];see e.g. People v Smith, 33 NY3d 454, 458 [2019]; People v Durant, 26 NY3d 341, 348 [2015]; People v Neulander, 221 AD3d 1412, 1413 [4th Dept 2023]).
Consistent with this, "[a] party is entitled to [a missing witness] charge only where an uncalled witness bearing information on a material issue would be expected to provide noncumulative testimony favorable to the opposing party and is under the control of and available to that party" (Zweben v Casa, 17 AD3d 583, 583 [2d Dept 2005] [internal citation and quotations omitted]; see e.g. Jackson v County of Sullivan, 232 AD2d 954, 955 [3d Dept 1996] ["A party is entitled to a missing witness charge when an uncalled witness possessing information on a material issue would be expected to provide noncumulative testimony in favor of the opposing party and is under the control of and available to that party"]). Indeed, this principle has been applied to cases involving the Mental Hygiene Law (see State v Jermaine B., 191 AD3d 888, 889-890 [2d Dept 2021] [request for missing witness charge denied as there was no demonstration witness would offer noncumulative testimony]; Matter of Richard E.,12 AD3d 1019, 1021 [3d Dept 2004] [negative inference appropriate where treating psychologist was under petitioner's control and could provide relevant noncumulative testimony]; Matter of Adam K. v Iverson, 110 AD3d 168 [2d Dept 2013]).
Regarding the application of this rule, Adam K. is particularly instructive. In that case, as here, the psychiatric center failed to offer the treating physician for testimony. Indeed, the court determined that the treating physician was available to testify. Rather, the psychiatric center relied on a physician that had met with the patient on a single occasion. In Adam K. the psychiatric center argued that pursuant to its policy, the treating physician should not testify to avoid interference with the relationship between the treating physician and patient, and that in any event, there was no requirement that the treating physician testify. The court, however, [*4]rejected that argument. In doing so, the court noted that the psychiatric center had offered no basis for its policy in general and as applied to the particular case, and that in any event, the policy was often not observed, in that treating physicians were regularly called to testify in such cases (Matter of Adam K. v Iverson, 110 AD3d at 179-180). Accordingly, the court concluded that the "missing witness rule" was applicable as the psychiatric center had failed to call an available witness who would be expected to offer noncumulative testimony (110 AD3d at 182). Indeed, in this regard, the court noted that the treating physician's testimony could hardly be characterized as cumulative as "[t]he quantity and quality of the information possessed by [the testifying physician and the treating physician] was vastly different" (id.).
Our analysis of the application of the "missing witness rule" begins with the fact that at no point did the Respondent raise any issue relating to it. Indeed, and of significance, is that the Respondent consented to the introduction of the treating physician's records, as well as to the expertise of Dr. Dar to testify about those records. Perhaps this results in a waiver of the argument. But at the very least, it certainly undermines its application.
Moreover, the instant case is readily distinguishable from Adam K. Here, Dr. Dar testified that the treating physician was not available and indeed was out for the week. Tr. at 7. No effort was made to address or challenge that assertion. This fact stands in stark contrast to the finding in Adam K., that the treating physician was available to testify as well as the court's determination that the basis proffered by the psychiatric center to have the non-treating physician testify instead was without merit. In any event, and separate and apart from this, given the volume of these type of cases, as well as the emergent need for relief, it may often be the case that a treating physician will be unavailable, thus making the broad application of the "missing witness rule" particularly inappropriate to these types of cases and thereby limiting Adam K. to its unique set of facts.
Finally, but also of note, is that the Hospital records, replete with information from the treating physician, were admitted into evidence without objection. Under such circumstances, it cannot be said that the nonproduction of evidence that would naturally have been produced permits the inference that its tenor would be unfavorable, the underlying basis of the "missing witness rule." Indeed, in essence, the witness was testifying from records which demonstrated exactly what the treating physician would have testified to, which were in fact favorable to the Hospital's position.
Accordingly, under the circumstances present here, the "missing witness rule" should not be applied.
It is well settled law that due process demands notice and an opportunity to be heard when a liberty interest is effected (see People v David W., 95 NY2d 130, 136-138 [2000], citing Mathews v Eldridge, 424 US 319, 334-335 [1976] ["The principle at the heart of the due process guarantees in the United States and New York Constitutions is that when the State seeks to take life, liberty or property from an individual, the State must provide effective procedures that guard against an erroneous deprivation" and furthermore that "[t]he bedrock of due process is notice and opportunity to be heard"]; see also People ex rel. Flores v Dalsheim, [*5]66 AD2d 381, 387 [2d Dept 1979], citing Mathews, 424 US at 349 ["Due process . . . requires that a person in jeopardy of serious loss be given notice of the case against him and the opportunity to meet it, according to the capacities and circumstances of those concerned"]).
As a threshold matter, argument could be made that the process due here is spelled out in Rivers v. Katz, and that therefore, any determination can only be made through the formula set forth in that case. Furthermore, undermining a due process claim in the instant matter, is that the Respondent did not object to the introduction of her medical records, which contain information from the attending psychiatrist. This is not to say that there could never be a case where the due process rights of an individual in the Respondent's situation would be found to have been violated by the failure to have the attending psychiatrist testify. The Court now only determines that this is not that case. Rather, as set forth below, this matter can be resolved without resort to a constitutional determination. As such, the court is duty bound to do so (see Matter of Syquia v Bd. of Educ. of Harpursville Cent. School Dist., 80 NY2d 531, 535 [1992] ["Under established principles of judicial restraint, however, courts should not address constitutional issues when a decision can be reached on other grounds"]; Zadvydas v Davis, 533 US 678, 699 [2001] ["interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute"]).
C. The Hospital Has Failed to Satisfy Its Burden of Proof
As stated in Rivers v Katz, but worth repeating now, as a threshold matter, the State bears the burden of demonstrating by clear and convincing evidence the patient's incapacity to make a treatment decision (67 NY2d at 497). Thereafter, if the court concludes that the patient lacks the capacity to determine the course of his own treatment, the State must then establish by clear and convincing evidence that "the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternate treatments" (Rivers, 67 NY2d at 497-98; see also Samuel D., 171 AD3d at 1173).
It may be that the Hospital has established by clear and convincing evidence that the Respondent lacks the capacity to determine the course of her treatment. Indeed, Dr. Dar's testimony appears to establish that the Respondent has a severely disorganized thought process, is internally preoccupied, and is refusing to take medication because "someone has been telling her not to take meds." Tr. at 3. This is consistent with the Hospital records wherein the treating physician indicates that the Respondent is hearing her mother tell her not to take the medication. And the records confirm, with respect to capacity, the rest of Dr. Dar's testimony as well.
However, the Court need not resolve this issue, as it is clear that the Hospital has failed to satisfy the second element of Rivers v Katz—that the "the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest, taking into consideration all relevant circumstances" (67 NY2d at 497-98). As acknowledged by Dr. Dar, the Respondent has a medical condition—a low Neutrophil count—which must be considered in any medical treatment plan. Indeed, as testified to by Dr. Dar, consistent with that condition, the [*6]administration of any of the suggested drugs could be dangerous. Tr. at 9. And, as testified to further by Dr. Dar, the Respondent's condition in the past has interfered with the administration of these drugs. Tr. at 8.
In this regard, Dr. Dar has never met the Respondent. Accordingly, the quality and quantity of information possessed by him is extremely limited and is vastly different and certainly much less than that of the attending physician. Accordingly, Dr. Dar is unfamiliar with all circumstances relevant to her condition, thereby limiting his understanding of what is in her best interests, and most importantly the adverse side effects associated with the suggested treatment, and any less intrusive alternatives. Indeed, at bottom, his understanding and testimony, while certainly truthful, is reduced to a reading from a cold record. Under such circumstances, the Hospital has failed to establish by clear and convincing evidence that it has satisfied the burden of proof relating to this second element.
Accordingly, it is hereby,
ORDERED, that the Petitioner's application is denied without prejudice to refiling.
This constitutes the Decision and Order of the Court.
Long Island City, New York
Dated: March 21, 2025
SCOTT DUNN, J.S.C.

Footnotes

Footnote 1:"Tr." refers to the transcript of the hearing in this matter held on March 13, 2025.